UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| W. Neudorff GmbH KG, ) | |
| ) | Civil Action No. 08-C-333 |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| Falcon Lab LLC ) | **AMENDED COMPLAINT** |
| ) | **AND JURY DEMAND** |
| Defendant. ) | |

Plaintiff W. Neudorff GmbH KG ("Neudorff") is a manufacturer of natural and organic herbicides. Defendant Falcon Lab LLC ("Falcon") has asserted that certain of Neudorff's herbicidal soap products infringe a patent held by Falcon, pertaining to the use of certain ammoniated soaps as herbicides. Falcon has taken to contacting Neudorff's licensees, customers, and at least one retailer of Neudorff's products, claiming that sale of Neudorff's products infringes Falcon's patent. Falcon's patent, however, is not infringed and is invalid. Its efforts to interfere with Neudorff's business relationships constitutes unfair competition, tortious interference, and is otherwise unlawful under Delaware law. Falcon has made its allegations in bad faith, and its conduct has irreparably harmed and, if unchecked, will continue to irreparably harm Neudorff's goodwill, reputation, and actual and prospective business relationships. Neudorff therefore seeks by its Complaint all damages caused by Falcon's unlawful conduct and an injunction preventing Falcon from continuing to make these bad faith, wrongful infringement claims.

## PARTIES

1. W. Neudorff GmbH KG is a foreign business entity organized under the laws of The Federal Republic of Germany.

2. On information and belief, defendant Falcon Lab LLC ("Falcon Lab") is a limited liability corporation organized and existing under the laws of the Delaware, having an address and a principal place of business at 1103 Norbee Drive, Wilmington, Delaware.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1331, 1332, and 1338(a).

4. This Court has personal jurisdiction over Falcon Lab because Falcon Lab is found and transacts business in this district, its unlawful activities have occurred and have caused injury in this district, and, on information and belief, is incorporated in this District. Upon information and belief, Falcon Lab offers for sale, sells, distributes, and purposefully ships products that Falcon Lab contends are covered by the patent-in-suit in this district.

5. Venue is proper pursuant to 28 U.S.C. § 1391(b) and 1391(c) as the unlawful acts Neudorff seeks to enjoin are occurring and have caused injury in this district.

## FACTS

6. Neudorff is a manufacturer and supplier of natural and organic plant protection products, including herbicides. Two of Neudorff's herbicide products are known as "H01 RTU Herbicidal Soap" and "H01 Concentrate Herbicidal Soap" (collectively "H01 Herbicidal Soaps"). Two of the beginning materials to form these products are pelargonic acid (a fatty acid) and ammonium hydroxide (a base). These two materials combine to form a compound known as "ammonium nonanoate soap" which is sometimes also known as "ammonium pelargonate."

Ammonium nonanoate soap is biologically active, meaning, it is this compound that actually kills the unwanted plant matter. This compound is the active ingredient in the H01 Herbicidal Soaps. The remaining ingredients in H01 Herbicidal Soaps are inert: their purpose is to mix with and help deliver the ammonium nonanoate (by spraying, for example) upon the unwanted plant matter.

7. In 1997, Neudorff applied for registration of its H01 Herbicidal Soaps with the U.S. Environmental Protection Agency ("EPA"). In Neudorff's letters to the EPA regarding its application for registration, Neudorff disclosed that the "sole active ingredient" of its products is "ammonia nonanoate soap, which is ammoniated soap of fatty acids." Neudorff submitted a copy of its label to the EPA, identifying the active ingredient and directions for use, among other information. Pursuant to the EPA's requirements, Neudorff's label identified "ammoniated soaps of fatty acids" as the active ingredient.

8. During 1997, Neudorff conducted a field test, in conjunction with scientists at California Polytechnic University at San Luis Obispo ("Cal Poly"), to develop data regarding the use of the H01 Herbicidal Soaps on common weed species in California. Pursuant to this field test, the H01 Herbicidal Soap was sprayed on nearly 20 types of weeds growing outdoors in California. The purpose of the field test was to document the use of the product on the weeds in California so that Neudorff would have this data to support its California registration. There was no duty on the Cal Poly researchers to keep this field test confidential. The information gathered in connection with this trial was later provided to the Department of Pesticide Regulation in the California Environmental Protection Agency to obtain registration in the State of California of the H01 Herbicidal Soaps.

9. By written agreement in 1998, Neudorff granted a license to a company called Necessary Organics, Inc., of New Castle, Virginia, the right to make and sell the Neudorff H01 RTU Herbicidal Soap (the "License Agreement").

10. Mr. Francis Addy, the President of Necessary Organics, had used the product in Virginia in 1998. Based on this use, decided that Necessary Organics should license the formula from Neudorff and make and sell the product.

11. The License Agreement required Necessary Organics to manufacture the product to Neudorff's specification, which Neudorff supplied to Necessary Organics. Necessary Organics was also required to ensure that the product complied with the registered EPA master label.

12. Necessary Organics marketed and sold this product under the brand name "CONCERN® Fast-Acting Weed Killer" ("CONCERN®"). CONCERN®'s active ingredient is ammonium nonanoate, which results from the combination of pelargonic acid and ammonium hydroxide. CONCERN®'s EPA registration number is 67702-7-50932. The identical composition of the two products was also confirmed in a letter from Neudorff to the California Environmental Protection Agency, dated November 4, 1998.

13. CONCERN® was made precisely to the manufacturing specifications of the H01 RTU Herbicidal Soap. CONCERN® was sold by Necessary Organics and used in the United States in 1998. The various marketing materials of Necessary Organics, including a copy of the CONCERN® packaging, a distributor's price list, a list of manufacturer's representatives, a fact sheet for the product, and sales records establish that the CONCERN® product was marketed as containing, as its active ingredient, "ammoniated soap of fatty acids."

14.     Necessary Organics's sales records establish that the first sales of CONCERN® occurred during the week of November 20, 1998, with the sale of 61 cases of the 32 fl. oz. product, and two cases of the 64 fl. oz. product. From November 20, 1998, until April 16, 1999, Necessary Organics sold 1075 cases of the 32 fl. oz. product and 118 cases of the 64 fl. oz. product. Shipments of these products were made to various distributors, including those in Missouri, Iowa, and Kansas, for sale at lawn and garden centers in the United States.

15.     Pursuant to the License Agreement, Neudorff received royalty payments resulting from Necessary Organics's sale of "CONCERN®."

16.     Consumers used Neudorff's Herbicidal Soap according to its directions to kill weeds prior to April 27, 1999.

17.     U.S. Patent 6,323,156 (the "'156 patent"), a copy of which is filed herewith as Attachment A, is described as a "Method of Using Ammonium Fatty Acid Salts as Non-Selective Herbicides." It was issued by the United States Patent and Trademark Office on November 27, 2001. The application that eventually matured into this patent was filed on April 27, 2000 (the "filing date"). The '156 patent designates Robert A. Smiley as "inventor," and Falcon Lab LLC as "assignee."

18.     On information and belief, Dr. Robert A. Smiley is the Chief Executive Officer of Falcon.

19.     The '156 patent has two independent claims: Claim 1 and Claim 10. Claim 1 is limited to a method for the prevention or elimination of undesired vegetation which comprises applying a herbicidally effective amount of an aqueous solution which contains, as the active ingredient, an ammonium salt of a fatty acid represented by the general formula: $R_1COO^-X^+$ wherein no more than 0.5 wt. % of the active ingredient is free fatty acid. Claim 10 is identical,

except that it substitutes "0.1 wt. %" for "0.5 wt. %." The '156 patent has a number of dependent claims as well (Claims 2-9 and 11-20) which further limit Claims 1 or 10.

20. It was already well known prior to the date of application for the '156 patent that the fatty acids identified in the '156 patent and their salts are herbicidal. This is true irrespective of whether the percentage by weight of the free fatty acid that remains in the solution after the reaction of the acid with the base is 0.5% or less. The percentage of free fatty acid remaining in the solution—whether it is 0.5 wt. % or less—is utterly irrelevant to its herbicidal properties at the levels in the H01 Herbicidal Soaps.

21. Another Neudorff licensee is a company named Gardens Alive!, Inc. ("Gardens Alive!"), located in Lawrenceburg, Indiana. Under license with Neudorff, Gardens Alive! makes a herbicide product with precisely the same active ingredient as the H01 Concentrate Herbicidal Soap. This product has been sold under the brand name Weed-Aside™ since approximately January 2000.

22. Falcon sent a letter to Gardens Alive! in or around November 2006 asserting that Gardens Alive!'s Weed-Aside™ herbicidal soap product infringes the '156 patent.

23. On December 20, 2006, counsel for Neudorff, William Geary, responded in writing to Falcon's assertion of infringement. In addition to explaining why Weed Aside™ would not meet the elements of the '156 patent, he also explained that, in 1998, Necessary Organics, Inc., a licensee of Neudorff, sold in the United States "a product having active ingredients identical to those of the Weed Aside™ product" which was used according to its instructions. Mr. Geary concluded that, "If you believe that the '156 patent covers the Weed Aside™ product, you must also agree that the sale in the United States of the identical product by

Necessary Organics more than one year before the April 27, 2000 filing date of the '156 patent would render invalid the claims of this patent at least pursuant to 35 USC § 102(b)."

24. On or about February 15, 2008, Falcon sent a letter to Neudorff and to representatives of Scotts Miracle Gro, Wal-Mart Stores, Schultz Company, and Gardens Alive!, Company—the latter three of whom sell or license the H01 Herbicidal Soaps—asserting that "all of Neudorff's licensees and their customers" are infringing the '156 patent and stating its intent to offer licenses "at reasonable terms for past infringement and future operations."

25. From November 2006 until February 2008, however, Neudorff and Falcon exchanged over a dozen letters comprising hundreds of pages of correspondence and attachments establishing that the '156 patent was in any event invalid due to prior use under Section 102(b). Falcon and Smiley implied falsely to a Neudorff licensee that Neudorff was aware that Neudorff was "guilty of contributory infringement."

26. As of November 2006 and certainly as of February 2008, Falcon had actual knowledge that its '156 patent was invalid under Section 102(b).

27. Falcon has made these demonstrably false assertions to parties with whom Neudorff has ongoing business relationships, such as Wal-Mart, Spectrum Brands, and Gardens Alive!. Falcon has claimed that "all licensees and customers" are infringers, and, thus, has likely communicated its meritless allegations to other licensees and customers of Neudorff, and retailers of Neudorff products.

28. These allegations facially are untrue and have harmed Neudorff's credibility with these parties. Wal-Mart has threatened to remove the H01 Herbicidal Soaps from its shelves. Neudorff has had to respond to letters and other inquiries to defend itself against the assertions.

29. Falcon's actions were intended specifically to harm Neudorff's reputation and business goodwill and to improperly inflict economic loss upon Neudorff. Falcon has acted with an improper motive and means. The damage to these relationships, many of them long standing, is irreparable, and would be difficult to quantify with precision.

## COUNT I
**(Declaration of Non-Infringement of U.S. Patent No. 6,323,156 28, U.S.C. § 2201 *et seq.*)**

30. Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 29 above.

31. An actual controversy exists between Neudorff and Falcon regarding whether Neudorff's herbicidal soap products infringe the '156 patent.

32. Plaintiff has not, and is not, infringing the '156 patent, either literally, or under the doctrine of equivalents, nor contributed to any infringement by others, nor actively induced others to infringe the '156 patent.

33. Plaintiff requests that this Court declare that Plaintiff is not liable for infringement of the '156 patent.

## COUNT II
**(Declaration of Invalidity of U.S. Patent No. 6,323,156, 28 U.S.C. § 2201 *et seq.*)**

34. Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 33 above.

35. An actual controversy exists between Neudorff and Falcon regarding whether the '156 patent is invalid.

36. The '156 patent is invalid for failure to comply with one or more conditions of patentability set forth in Title 35, United States Code.

37. Plaintiff requests that this Court declare that the '156 patent is invalid.

## COUNT III
### (Unfair Competition under the Lanham Act)

38. Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 37 above.

39. Defendant made a false or misleading statement of fact in commercial advertising or promotion about Neudorff's goods or services.

40. This statement actually deceives or is likely to deceive a substantial segment of its intended audience.

41. The deception is material in that it is likely to influence decisions to purchase its goods or to do business with Neudorff.

42. Defendant made the statement in bad faith.

43. Defendant caused the statement to enter interstate commerce.

44. The statement has resulted in actual or probable injury to Neudorff.

45. Defendant is liable to Neudorff for unfair competition under the Lanham Act, 15 U.S.C. § 1125(a).

## COUNT IV
### (Tortious Interference with Actual or Prospective Business Relations Under Common Law)

46. Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 45 above.

47. Neudorff has a valid business relationship or expectancy with its licensees, customers, retailers carrying its products, and third parties who are prospective licensees, customers, and retailers of Neudorff products.

48. Defendant has knowledge of these relationships or expectancies.

49. By its actions, including making baseless infringement allegations against Neudorff, demanding that licensees, customers, and retailers cease and desist from making, selling, purchasing, or carrying Neudorff's products, and demanding that these parties provide an accounting of sales, defendant has intentionally interfered with Neudorff's business relationships and expectancies.

50. Defendant's intentional interference has induced or caused a breach of these relationships or expectancies.

51. Neudorff has suffered and continues to suffer damages as a result of defendant's intentional interference.

## COUNT V
### (Delaware Deceptive Trade Practice Act)

52. Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 51 above.

53. Defendant, in the course of its business, vocation, or occupation, represented that Neudorff's goods or services infringe the '156 patent, which is a false characterization.

54. Defendant, in the course of its business, vocation, or occupation, disparaged the goods, services, or business of Neudorff by claiming that the goods or services infringe the '156 patent, which is a false or misleading representation of fact.

55. Defendant, in the course of its business, vocation, or occupation, engaged in conduct that has created a likelihood of confusion or of misunderstanding.

56. As such, Defendant is liable to Neudorff under Title 6 of Delaware Code, sections 2531 *et seq.*

## COUNT VI
**(Injunction)**

57. Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 52 above.

58. Falcon Lab has demonstrated a substantial likelihood of prevailing on the merits of its claims.

59. Falcon Lab's unlawful acts, taken in bad faith, will continue unless enjoined by this Court.

60. Neudorff has been damaged by Falcon Lab's acts. Falcon Lab has made and is making unlawful gains and profits from its acts and has thereby deprived and continues to deprive Neudorff of rights and remuneration which would have accrued to it but for Falcon Lab's conduct.

61. Falcon Lab will not be harmed by the issuance of an injunction.

62. The balance of harms favors Neudorff.

63. The public interest favors Neudorff.

## PRAYER FOR RELIEF

WHEREFORE, Neudorff prays:

A. For judgment declaring that it and its licensees have not infringed, induced infringement, or contributed to infringement and are not infringing, inducing infringement, or contributing to infringement of the '156 patent;

B. For judgment declaring that the '156 patent is invalid;

C. For judgment and damages on its claim of tortious interference with advantageous business relations;

D. For judgment and damages on its claim of unfair competition;

E. For judgment and damages on plaintiff's claim of deceptive trade practices;

F. For injunctive relief against Falcon Labs and any other person in privity with Falcon Labs from charging infringement of the '156 patent against Neudorff or its licensees, or anyone in privity with it or them, including its and their respective successors, assigns, agents, servants, officers, directors, representatives, employees, attorneys, customers, and suppliers and all those persons and entities in active concert or participation with any of them;

G. For a finding that this case is exceptional and award Neudorff its attorneys' fees, costs, and expenses in this action as authorized by 35 U.S.C. § 285; and

H. For all such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 5, 2008

W. NEUDORFF GmbH KG,

By its attorneys,

*/s/ John C. Phillips, Jr.*

John C. Phillips, Jr., Esquire (Bar I.D. No. 110)
Phillips, Goldman & Spence, P.A.
Pennsylvania Ave. and Broom Street
1200 North Broom Street
Wilmington, DE 19806
Phone: (302) 655-4200

Of Counsel:
Stephen J. Brake
Rachel J. Sherman
Nutter McClennen & Fish, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
T: 617-439-2000
F: 617-310-9

# EXHIBIT A

US006323156B1

(12) **United States Patent**
     Smiley

(10) Patent No.: **US 6,323,156 B1**
(45) Date of Patent: **Nov. 27, 2001**

(54) **METHOD OF USING AMMONIUM FATTY ACID SALTS AS NON-SELECTIVE HERBICIDES**

(75) Inventor: **Robert A. Smiley**, Wilmington, DE (US)

(73) Assignee: **Falcon Lab LLC**, Wilmington, DE (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/560,664**

(22) Filed: **Apr. 27, 2000**

(51) Int. Cl.$^7$ .................................................. **A01N 37/00**
(52) U.S. Cl. ............................................................ **504/320**
(58) Field of Search ................................................ 504/320

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,919,733 * 7/1999 Sedun et al. .......................... 504/320

* cited by examiner

*Primary Examiner*—Alton Pryor
(74) *Attorney, Agent, or Firm*—Locke Liddell & Sapp LLP

(57) **ABSTRACT**

A method for controlling undesired vegetation that comprises contacting the vegetation with a herbicidally effective amount of a composition containing the compound of the formula $R_1COO^-X^+$ wherein $R_1$ is a $C_6$ to $C_{19}$ hydrocarbyl group optionally substituted with one or more hydroxyl or $C_1$–$C_5$ hydrocarbyl groups, and X is ammonium.

**20 Claims, No Drawings**

1

# METHOD OF USING AMMONIUM FATTY ACID SALTS AS NON-SELECTIVE HERBICIDES

## FIELD OF THE INVENTION

The present invention relates to the use of ammonium salts of fatty acids as non-selective herbicides to destroy the growth of plants.

## BACKGROUND OF THE INVENTION

There are two major categories of herbicides to treat growing weeds—selective and non-selective. Selective herbicides only kill selected weeds such as broad leafed plants like dandelion, an example being the well-known herbicide 2,4-D. The non-selective herbicides kill all weeds. Commercially known non-selective herbicides include glyphosate (such as ROUNDUP®) and paraquat. Paraquat is a known hazardous material. Roundup often has a higher than desired kill time. Non-hazardous non-selective herbicides exhibiting decreased kill time are desired.

It is therefore a principal object of this invention to provide non-hazardous non-selective herbicides having low kill time for use on unwanted vegetation.

## SUMMARY OF THE INVENTION

Vegetation may be killed by application of a composition of the formula:

$$R_1COO^-X^+ \qquad (I)$$

wherein $R_1$ is a $C_6$ to $C_{19}$ hydrocarbyl group and X is ammonium ($NH_4^+$). In the formula (I), any of the hydrogen on $R_1$ may be substituted with one or more hydroxyl or $C_1$–$C_5$ hydrocarbyl group, such as an alkyl group. The herbicidal composition of the invention contains essentially no free fatty acid content. Such compounds have been found to act as "non-selective" herbicides.

The invention relates to a method for killing unwanted vegetation, by applying to the locus of the unwanted vegetation a herbicide of formula (I). The composition may be applied as an aqueous solution and may further contain a surfactant. Since the mode of action appears to be through the leaves of the vegetation, there is little, if any, residual herbicidal effect in the ground. Thus, it is possible to grow desirable plants adjacent to and around the treated area.

## DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

Unwanted vegetation may be killed by wetting the locus of the vegetation with a composition represented by the formula:

$$R_1COO^-X^+ \qquad (I)$$

wherein $R_1$ is a saturated or unsaturated $C_6$ to $C_{19}$ hydrocarbyl (preferably a $C_7$ to $C_{11}$ hydrocarbyl), or an epoxide or cycloproparie thereof, X is ammonium, ($NH_4$), and any of the hydrogen on $R_1$ may be substituted with one or more hydroxyl or $C_1$–$C_5$ hydrocarbyl groups. This herbicidal composition contains less than 0.5 wt. % free fatty acids. More preferred, the herbicidal composition of the invention contains less than 0.1 wt. % free fatty acids. In a most preferred embodiment, the herbicidal composition of the invention contains essentially no free fatty acids. The composition of the invention may further contain a diluent.

Any solvent in which the herbicide is soluble may be employed as a diluent. As a post-emergent, the herbicides of the invention are preferably applied to the locus of the unwanted vegetation as an aqueous solution.

The method of the invention may be used to control established vegetation in the vicinity of a seeded crop or in a weed concentrate area by contacting the foliage of the unwanted vegetation with the herbicidal composition. The herbicidal activity of such herbicidal compositions rapidly dissipates in the unwanted vegetation upon contact.

The herbicide is applied as a solution to the locus of the unwanted vegetation in effective amounts. Typically, the herbicide is applied as an aqueous solution wherein the amount of herbicide in the formulation is between about 3 to about 17, weight percent, preferably about 5 to about 15, weight percent, more preferably for some applications from about 5 to about 10, weight percent and for some other applications from about 10 to about 15, weight percent.

The herbicides of the invention exhibit several advantages not previously seen with other commercial herbicides. These advantages include:

More Rapid Kill Time.

Vegetation usually starts to die within an hour after receiving a single application. Typically unwanted vegetation is dead in less than 24 hours. Some readily obtainable herbicides require at least seven days. Further, herbicides evidencing quicker kill times in the prior art are highly toxic.

Based on Naturally Occurring Compounds.

Suitable herbicides for use in the invention include several based on acids found in nature. No commercially known water soluble herbicides are based on naturally occurring compounds.

Action is Through the Leaves.

In light of the quick kill time of the herbicidal compositions of the invention, reseeding can take place immediately. Most commercial herbicides must be allowed to degrade before reseeding.

Non-toxic and Biodegradable.

Herbicides within the invention are non-toxic and further are biodegradable. Most commercial herbicides are hazardous to apply.

Low Cost.

The herbicides of the invention are relatively low in cost.

Easy Transportation.

Unlike most commercial herbicides which as liquids must be shipped in containers requiring special disposal methods, the herbicides of the invention are water soluble solids and thus may be shipped in readily disposable containers. Upon reaching their desired location, the solid herbicide may be prepared into solutions at their requisite strength. Alternatively, the herbicides of the invention may be shipped as liquid compositions.

The herbicidal composition of the invention is contacted with the foliage of the unwanted vegetation by spraying or otherwise distributing the composition onto the foliage. Leaves of vegetation sprayed with herbicidal compositions of the invention usually start to shrivel or turn brown within hours after application. Necrosis is evident, usually in 24 hours. In the case of smaller weeds such as dandelions, chickweed and other common lawn weeds, the roots of the plants also shrivel and turn brown or black within 24 hours.

Spraying is a preferred method of wetting the leaves. A light spray is usually sufficient to kill the plant at ambient temperatures above 20° C. without any additional treatment. Herbicidal effectiveness generally increases with temperature.

Weeds and grasses which have been killed by use of the herbicidal composition of the invention include quack grass, buttercup, common cinquefoil, multi flora rose, common

3

yellow woodsorrel, prostrate spurge, poison ivy, poison hemlock, common speedwell, broadleaf plantain, Japanese honeysuckle, dandelion, wild violet, Bermuda grass, nutsedge, wild garlic, knotweed, red sorrel, lambs quarters, pokeweed, carpetweed, crabgrass, buckhorn plantain, nimblewill or common chickweed.

The following examples will illustrate the practice of the present invention in its preferred embodiments. Other embodiments within the scope of the claims herein will be apparent to one skilled in the art from consideration of the specification and practice of the invention as disclosed herein. It is intended that the specification, together with the examples, be considered exemplary only, with the scope and spirit of the invention being indicated by the claims which follow.

EXAMPLE 1

A 12 liter round bottom kettle equipped with stirrer and capable of being cooled was charged with 1218.8 gm. (7.7 mole) of pelargonic acid and 3440 ml. of deionized water. To this was fed with stirring 910.7 gm. 30% ammonium hydroxide. The temperature was maintained below 30° C. by cooling and adjusting the feed rate. The mixture became very thick and difficult to stir when approximately 15% of the total ammonium hydroxide had been added. To get better stirring, 2016 ml. more deionized water was added for a total of 5456 ml. When approximately 65% of the ammonium hydroxide was added, the solution turned crystal clear and remained so until all the ingredients were mixed. The final water white solution contained 17% ammonium pelargonate. Isolated anhydrous ammonium pelargonate from this solution is a soft, white, crystalline solid melting at 62° C. Ammonium pelargonate is extremely water soluble but is insoluble in acetone.

EXAMPLE 2

Jimson weed, soybean, common ragweed and annual grass (combination of annual bluegrass and fall panicum) were grown in 12 inch by 12 inch flats in a greenhouse maintained at 80° F. with supplemental lighting used to extend daylength to 16 hrs. Flats were watered as needed. When the plants were 3–6 inches high they were sprayed with a solution of 5% ammonium pelargonate solution prepared by dilution of a 17% solution with the required amount of water. The spraying was done in a spray chamber with a track mounted sprayer adjusted to spray at a rate of 50 gallon/acre. The control (degree of injury) obtained was Jimson weed (85%), soybean (75%) common ragweed (30%) while annual grass control was less than 10%.

EXAMPLE 3

Using the same procedure as set forth in Example 2, the flats were seeded with velvetleaf, annual morning glory, common ragweed and crabgrass. After growth some flats were treated with 5% ammonium pelargonate solution while others were sprayed with 10% ammonium pelargonate in the spray chamber at the same 50 gallon/acre rate. There was only a slight difference in the control ate between the two concentrations. At the 10% concentration, velvetleaf control was 90%, morning glory was 90%, common ragweed was 85% and crabgrass was 70%.

EXAMPLE 4

The same mixture used in Example 1 was sprayed on all of the leaves of larger plants including poison hemlock,

4

Japanese honeysuckle, poison ivy, multiflora rose, tall buttercup, pokeweed, ragweed, wild grape and lambsquarters. All treated plants died within 24–48 hours. There was no re-growth.

EXAMPLE 5

The leaves of tree suckers sprouting from the stumps of a variety of sawed off trees were sprayed with the mixture used in Example 1. The sprouts all died within 24–48 hours and no new growth from the stumps occurred.

EXAMPLE 6

Dilute ammonium hydroxide was added to 125 g. of pelargonic acid until the pH of the resulting solution was 7 as indicated by pH paper. Enough water was added to bring the total solution to 2 liters. This 6.9% neutral solution of ammonium pelargonate was sprayed from a hand sprayer on dandelion, moneywort, Japanese honeysuckle, star of Bethlehem and henbit. Damage to the plants was evident within 4 hours as evidenced by wilting and/or change of color. The treated dandelion was dead within 12 hours. The rest were dead within 24–36 hours. This solution foamed on contact with the plant leaves.

EXAMPLE 7

The following weeds growing in the wild were treated with a 10% water solution of ammonium pelargonate: common evening primrose, Japanese honeysuckle, multiflora rose, common chickweed, henbit, wild onion, hairy bitter cress, dandelion and plantain. Treatment consisted of wetting the leaves of the plants with a hand sprayer. Damage was apparent on all plants within 12 hrs as evidenced by wilting and discoloration. The treated plants were all dead within 36–48 hours.

EXAMPLE 8–9

Large crabgrass, giant foxtail, jimsonweed, velvetleaf and annual morning-glory were seeded into 12 inch by 12 inch flats filled with potting soil maintained in a greenhouse of 80° F. Supplemental lighting was used to extend daylength to 16 hours. The flats were watered as needed. Three weeks after planting, when the grasses were about 3 inches tall and the broadleaves were 2 to 4 inches tall, individual flats were treated with 5, 7.5, 10 and 15% solutions of ammonium pelargonate. For comparison purposes, other flats were treated with the same concentrations of pelargonic acid prepared from a commercially available herbicide sold under the tradename "Scythe" by Dow AgraSciences. The solutions were applied with a track-mounted sprayer in a spray booth at the rate of 50 gal./acre.

Ammonium pelargonate application resulted in plant injury within hours of application. Symptoms were typically water-soaked lesions that quickly resulted in dead tissue. Maximum injury symptoms were observed in the first week after treatment. With morning-glory, all concentrations gave the same control of 70%. However, with jimson weed there was a rate response with increasing rates giving increased control. Velvetleaf control was better at the 10 and 15% rates than at the 5 and 7.5% rates.

In relation to pelargonic acid, ammonium pelargonate was better than the commercial "Scythe" formulation. Lower concentrations of ammonium pelargonate gave better jimsonweed control than "Scythe" at higher concentration. At equal concentrations, ammonium pelargonate gave better control of velvetleaf and morning-glory than "Scythe", particularly at one week after treatment.

| 5 | 6 |

COMPARATIVE

EXAMPLE 10

The same variety of weeds set forth in Example 7 were treated with a 10% solution of potassium pelargonate made by neutralizing 80 gm. Pelargonic acid in 200 ml. water with 50% aqueous potassium hydroxide to a pH of 7 as indicated by pH paper followed by dilution with water to 1 liter of solution. None of the weeds were affected by the potassium pelargonate solution even after a week. Thus, ammonium pelargonate has herbicidal properties while the potassium salts has none.

What is claimed is:

1. A method for the prevention or elimination of undesired vegetation which comprises applying to the vegetation a herbicidally effective amount of an aqueous solution which contains, as the active ingredient, a salt represented by the formula:

$$R_1COO^-X^+ \qquad (I)$$

wherein $R_1$ is a $C_6$ to $C_{19}$ hydrocarbyl group, optionally substituted with a hydroxyl or a $C_1$–$C_5$ hydrocarbyl group; and

X is ammonium;

wherein no more than 0.5 wt. % of the active ingredient is free fatty acid.

2. The method of claim 1, wherein the composition contains two or more compounds of formula $R_1COO^-X^+$.

3. The method of claim 1, wherein $R_1$ is a $C_7$ to $C_{11}$ hydrocarbyl group.

4. The method of claim 3, wherein the compound of formula (I) is ammonium pelargonate.

5. The method of claim 1, wherein the composition contains two or more salts represented by formula (I) wherein $R_1$ is selected from $C_8$, $C_9$, and $C_{10}$ hydrocarbyl groups.

6. The method of claim 5, wherein one of the salts is ammonium pelargonate.

7. The method of claim 1, wherein the composition further comprises a diluent.

8. The method of claim 7, wherein the diluent is water and the compound of formula (I) is ammonium pelargonate.

9. The method of claim 1, wherein the vegetation is quack grass, buttercup, common cinquefoil, multi flora rose, common yellow woodsorrel, prostrate spurge, poison ivy, poison hemlock, common speedwell, broadleaf plantain, Japanese honeysuckle, dandelion, wild violet, Bermuda grass, nutsedge, wild garlic, knotweed, red sorrel, lambs quarters, pokeweed, carpetweed, crabgrass, buckhorn plantain, nimblewill or common chickweed.

10. A method for the prevention or elimination of undesired vegetation which comprises applying to the vegetation a herbicidally effective amount of an aqueous solution which contains, as the active ingredient, a salt represented by the formula:

$$R_1COO^-X^+ \qquad (I)$$

wherein $R_1$ is a $C_6$ to $C_{19}$ hydrocarbyl group, optionally substituted with a hydroxyl or a $C_1$–$C_5$ hydrocarbyl group; and

X is ammonium;

wherein no more than 0.1 wt. % of the active ingredient is free fatty acid.

11. The method of claim 10, wherein the composition contains two or more salts of the formula $R_1COO^-X^+$.

12. The method of claim 10, wherein $R_1$ is a $C_7$ to $C_{11}$ hydrocarbyl group.

13. The method of claim 12, wherein the salt of formula (I) is ammonium pelargonate.

14. The method of claim 10, wherein the composition contains two or more salts represented by formula (I) wherein $R_1$ is selected from $C_8$, $C_9$, and $C_{10}$ hydrocarbyl groups.

15. The method of claim 14, wherein one of the salts is ammonium pelargonate.

16. The method of claim 10, wherein the composition further comprises a diluent.

17. The method of claim 16, wherein the diluent is water and the compound of formula (I) is ammonium pelargonate.

18. The method of claim 10, wherein the vegetation is quack grass, buttercup, common cinquefoil, multi flora rose, common yellow woodsorrel, prostrate spurge, poison ivy, poison hemlock, common speedwell, broadleaf plantain, Japanese honeysuckle, dandelion, wild violet, Bermuda grass, nutsedge, wild garlic, knotweed, red sorrel, lambs quarters, pokeweed, carpetweed, crabgrass, buckhorn plantain, nimblewill or common chickweed.

19. The method of claim 1, wherein the composition contains from about 5 to about 10 percent by weight of the compound of formula (I).

20. The method of claim 1, wherein the composition contains from about 10 to about 15 percent by weight of the compound of formula (I).

\* \* \* \* \*