UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| W. Neudorff GmbH KG, | ) | Civil Action No. 08-C-333 |
| Plaintiff, | ) | |
| v. | ) | MEMORANDUM IN SUPPORT |
| | ) | OF PLAINTIFF'S MOTION FOR |
| Falcon Lab LLC | ) | PRELIMINARY INJUNCTION |
| Defendant. | ) | |

Plaintiff W. Neudorff GmbH KG ("Neudorff") is a manufacturer of natural and organic herbicides. Defendant Falcon Lab LLC ("Falcon") has asserted that certain of Neudorff's herbicidal soap products infringe a patent held by Falcon, pertaining to the use of certain ammoniated soaps as herbicides. Falcon contacted Neudorff's licensees, customers, and at least one retailer of Neudorff's products, claiming that the sale and use of Neudorff's products infringes Falcon's patent. Falcon is demanding that a license be taken and royalties be paid to Falcon under its patent.

Neudorff's products do not infringe Falcon's patent. Moreover, even assuming that Falcon's patent would be infringed by the use of Neudorff's herbicidal soap products, the Falcon patent is indisputably invalid because its claims are anticipated by the use of Neudorff's herbicidal soap products in the United States more than one year before the filing date of Falcon's patent application. The products were tested in California, sold to distributors in the Mid-West, and used in Virginia by the President of a company considering whether to license the product, all more than one year before Falcon's patent application's filing date. There is no genuine dispute over these facts. Indeed, this reflects the fact that the use of certain ammoniated soaps as herbicides was already well known before Falcon's patent application was filed as a

result of prior work performed by persons associated with Neudorff.

As such, the claims of Falcon's patent are invalid under 35 U.S.C. § 102(b). Falcon, moreover, is aware of the overwhelming evidence of invalidity due to prior use of Neudorff's herbicidal soap products. Yet, in a pure exercise of bad faith, Falcon continues to make its infringement claims to Neudorff's licensees, to customers, and to Wal-Mart, in an unfair and deceptive effort to extract royalty payments and to interfere with Neudorff's existing commercially valuable relationships with these parties.

Falcon's bad faith conduct has irreparably harmed and, if unchecked, will continue to irreparably harm Neudorff's goodwill, reputation, and actual and prospective business relationships. Neudorff therefore seeks a preliminary injunction preventing Falcon from continuing to make these bad faith, wrongful infringement claims.

## I.    STATEMENT OF UNDISPUTED FACTS

### Neudorff's Herbicidal Soap Products And Their EPA Registration

Neudorff is a manufacturer and supplier of natural and organic plant protection products, including herbicides. (Declaration of Cameron Wilson, "Wilson Decl." at ¶ 1.)[1] Two of Neudorff's herbicide products are known as "H01 RTU Herbicidal Soap" and "H01 Concentrate Herbicidal Soap" (collectively "H01 Herbicidal Soaps"). (Declaration of George Puritch, Ph.D., "Puritch Decl." at ¶ 3.) Two of the beginning materials to form these products are pelargonic acid[2] (a fatty acid) and ammonium hydroxide (a base). (Id. at ¶ 4.) These two materials combine to form a compound known as "ammonium nonanoate soap" which is sometimes also known as "ammonium pelargonate." (Id. at ¶ 4.) Ammonium nonanoate soap is biologically active,

---

[1] Neudorff's headquarters is in Germany, and it conducts its U.S. operations through Neudorff North America. (Wilson Decl. at ¶ 1.)

[2] Pelargonic acid is a fatty acid whose molecule has 9 carbon atoms. Thus, it is referred to as a "$C_9$ fatty acid." (Puritch Decl. at ¶ 4.)

meaning, it is this compound that actually kills the unwanted plant matter. (*Id.* at ¶ 6.) This compound is the active ingredient in the H01 Herbicidal Soaps.[3] (*Id.*) The remaining ingredients in H01 Herbicidal Soaps are inert: their purpose is to mix with and help deliver the ammonium nonanoate soap (by spraying, for example) upon the unwanted plant matter. (*Id.*)

In 1997, Neudorff applied for registration of its H01 Herbicidal Soaps with the U.S. Environmental Protection Agency ("EPA"). (*Id.* at ¶ 9.) In Neudorff's letters to the EPA regarding its application for registration, Neudorff disclosed that the "sole active ingredient" of its products is "ammonia nonanoate soap, which is ammoniated soap of fatty acids."[4] (*Id.*, & Ex. C.) In its "Statement of Formula," also submitted to the EPA, Neudorff disclosed that pelargonic acid and ammonium hydroxide are the beginning materials used to make the ammonium nonanoate. (*Id.* at ¶ 10.) Neudorff submitted a copy of its label to the EPA, identifying the active ingredient and directions for use. (*Id.* at ¶ 11 & Ex. F.) Pursuant to the EPA's requirements, Neudorff's label identified "ammoniated soaps of fatty acids" as the active ingredient.[5] The EPA's own chemistry review of the product confirmed that the active ingredient was as Neudorff represented—ammonium nonanoate. (*Id.* at ¶ 13 & Ex. G.)

***Neudorff's H01 Herbicidal Soap Was First Used In The United States in 1997***

---

[3] The term "active ingredient" used in this memoranda means having a biologically active purpose. Nothing should be inferred from this memorandum's use of that term, or any other term present in the patent-in-suit (U.S. Patent 6,323,156) about Neudorff's position regarding the meaning of claim terms in the patent, which Neudorff expressly reserves until such time as the Court may set.

[4] As explained by Dr. Puritch, in this letter the word "ammonia" should have read "ammonium;" the reader would recognize the term to mean "ammonium nonanoate" since there is no compound known as "ammonia nonanoate." (Puritch Decl. at ¶ 9, n.1.) This is a simple error that is easy to make: the EPA's report of its own chemistry review of the product also committed this common misuse. (*Id.* at ¶ 12 & Ex. G.)

[5] The EPA allows manufacturers to use this more general term for ammonium nonanoate on its label. (Puritch Decl. at ¶ 5, & Ex. B.) Those familiar with the chemistry of pesticides would know that the term "ammoniated soap of fatty acids" in the context of a herbicidal soap is a general term that includes a number of soaps made from certain fatty acids, and that ammonium nonanoate is one such soap. (*Id.*)

During 1997, Neudorff conducted a field test, in conjunction with scientists at California Polytechnic University at San Luis Obispo ("Cal Poly"), to develop data regarding the use of the H01 Herbicidal Soaps on common weed species in California. (Wilson Decl. at ¶ 5; Puritch Decl. at ¶ 15 & Ex. H.) Pursuant to this field test, the H01 Herbicidal Soap was sprayed on nearly 20 types of weeds growing outdoors in California. (*Id.*) The purpose of the field test was to document the use of the product on the weeds in California so that Neudorff would have this data to support its California registration.[6] (Puritch Decl. at ¶¶ 15, 16.) The information gathered in connection with this trial was later provided to the Department of Pesticide Regulation in the California Environmental Protection Agency to obtain registration in the State of California of the H01 Herbicidal Soaps. (*Id.* at ¶ 16.)

By written agreement in 1998, Neudorff granted a license to a company called Necessary Organics, Inc., of New Castle, Virginia, to make and sell the Neudorff H01 RTU Herbicidal Soap (the "License Agreement"). (Wilson Decl. at ¶ 6, Ex. A.) The License Agreement required Necessary Organics to manufacture the product to Neudorff's specification, which Neudorff supplied to Necessary Organics. (*Id.*) Necessary Organics was also required to ensure that the product complied with the registered EPA master label. (*Id.*)

Beginning in late 1998, Necessary Organics marketed and sold this product under the brand name "CONCERN® Fast-Acting Weed Killer" ("CONCERN®").[7] The CONCERN® brand of H01 Herbicidal Soap has as its active ingredient ammonium nonanoate, which results from the combination of pelargonic acid and ammonium hydroxide. (Puritch Decl. at ¶ 18; Addy

---

[6] This test was conducted in the open, and the Cal Poly researchers were under no confidentiality obligation. (*Id.* at ¶ 16.)

[7] CONCERN® continues to be sold today by Woodstream Corp., which acquired the rights in CONCERN®. (Wilson Decl. at ¶ 6.)

Decl. at ¶ 10.)[8]  CONCERN® was registered with the EPA (registration number 67702-7-50932) and one document submitted to the EPA, dated in or around August 1998, confirms that CONCERN® is the same product as the H01 RTU Herbicidal Soap.  (Addy Decl. at ¶ 9 & Ex. I.) Further, a letter from Neudorff to the California Environmental Protection Agency, dated November 4, 1998, also confirms that CONCERN® was the same product as the H01 Herbicidal Soap.  (Puritch Decl. at ¶ 20.)[9]

Mr. Francis Addy, the former President of Necessary Organics, states that he used the H01 Herbicidal Soap in the spring of 1998 in Virginia to assist him in deciding whether his company should license and make the product.  He found the product to be effective, and negotiated a licensing arrangement with Neudorff pursuant to which Necessary Organics made and sold the product. (Addy Decl. at ¶¶ 2-3 & Ex. 3.)  He confirms that the CONCERN® product was made precisely to the manufacturing specifications of the H01 RTU Herbicidal Soap.  (*Id.* at ¶¶ 4, 10.)  Mr. Addy oversaw the business of making and selling the CONCERN® product.  (*Id.* at ¶ 1.)

Necessary Organics's first sales of the product were made to distributors in the Mid-West beginning in November 1998.  (*Id.* at ¶ 6.)  Necessary Organic's sales records, provided by Mr. Addy, establish that the first sales of CONCERN® occurred during the week of November 20, 1998, with the sale of 61 cases of the 32 fl. oz. product, and two cases of the 64 fl. oz. product.  (*Id.* at ¶ 6 & Exs. E, F.)  From November 20, 1998, until April 16, 1999, Necessary Organics sold 1075 cases of the 32 fl. oz. product and 118 cases of the 64 fl. oz. product.  (*Id.* at ¶ 6.)

---

[8] The various marketing materials of Necessary Organics, including a copy of the CONCERN® packaging and a fact sheet for the product further demonstrate that the CONCERN® product was marketed as containing, as its active ingredient, "ammoniated soap of fatty acids."  (Addy Decl. at ¶ 5, & Exs. C, D.)

[9] The letter stated that "Concern Fast Acting Weed Killer, EPA Reg. 67702-7-50932" is "identical in composition and labeling (with certain minor exceptions allowed by law) to Neudorff's products . . . H01 RTU Herbicidal Soap, EPA Reg. 67702-7."  (Puritch Decl. at ¶ 20, Ex. J.)

Shipments of these products were made to various distributors, including those in Missouri,

Iowa, and Kansas, for sale at lawn and garden centers in the United States. (*Id.* at ¶ 8.) Both Mr.

Addy and Dr. George Puritch, by Declaration, attest that pursuant to the License Agreement,

Neudorff received royalty payments resulting from Necessary Organics's sale of "CONCERN®."

(*Id.* at 7; Puritch Decl. at ¶19.)

Mr. Addy further states by Declaration:

> There is no question, based both on my memory and on Necessary
> Organics's business records, that Necessary Organics
> manufactured CONCERN® as specified by Neudorff's
> specification for the ready-to-use H01 herbicidal soap.
>
> Further, there is no question that CONCERN® was in use in the
> United States prior to April 27, 1999. I used it in the spring of
> 1998 in Virginia to see how effective the product was at killing
> weeds. Based on this use, I decided that Necessary Organics
> should license the formula from Neudorff and make it and sell it.
> The distributors I sold the product to in turn supplied retailers and I
> am confident based on the volume of my sales that the product was
> sold to consumers who used it according to the directions to kill
> weeds prior to April 27, 1999.

(Addy Decl. at ¶¶ 10-11.) Thus there is no question that Neudorff's H01 Herbicidal Soap was

first used in the United States in 1997.

### The '156 Patent: *Method Of Using Ammonium Fatty Acid Salts as Non-Selective Herbicides*

U.S. Patent 6,323,156 (the "'156 patent") is described as a "Method of Using Ammonium

Fatty Acid Salts as Non-Selective Herbicides." The '156 Patent was issued by the United States

Patent and Trademark Office on November 27, 2001. The application that eventually matured

into this patent was filed on April 27, 2000 (the "filing date"). The '156 patent designates

Robert A. Smiley as "inventor," and Falcon Lab LLC as "assignee." A copy of the '156 patent is

attached as <u>Exhibit A</u> to the Complaint.

The '156 patent has two independent claims:  Claim 1 and Claim 10.  Claim 1 is limited to a method for the prevention or elimination of undesired vegetation which comprises applying a herbicidally effective amount of an aqueous solution which contains, as the active ingredient, an ammonium salt of a fatty acid[10] represented by the general formula: $R_1COO^-X^+$ wherein no more than 0.5 wt. % of the active ingredient is free fatty acid.  Claim 10 is identical, except that it substitutes "0.1 wt. %" for "0.5 wt. %."  The '156 patent has a number of dependent claims as well (Claims 2-9 and 11-20) which further limit Claims 1 or 10.

As Dr. George Puritch attests, it was already well known prior to the date of application for the '156 patent that the fatty acids identified in the '156 patent and their salts are herbicidal.[11] (Puritch Decl. at ¶ 23).  This is true, he explains, irrespective of whether the percentage by weight of the free fatty acid that remains in the solution after the reaction of the acid with the base is 0.5% or less.  (*Id.* at ¶¶ 7, 23)  The percentage of free fatty acid remaining in the solution—whether it is 0.5 wt. % or less—is utterly irrelevant to its herbicidal properties.  (*Id.*)[12]

---

[10] A salt of a fatty acid is called a soap.  (Puritch Decl. at ¶ 4.)

[11] Falcon cannot dispute this.  For example, it admitted, as early as January 2007, that "it has been known for decades that pelargonic acid is herbicidal . . . ."  (Declaration of William C. Geary at Ex. 2.)

[12] Dr. Puritch also attaches to his Declaration patents that predate the '156 patent, including Dr. Puritch's own prior work, that demonstrate that it was already well known that ammoniated soap of pelargonic acid is herbicidal.  (Puritch Decl. at ¶¶ 24, 25 & Exs. K, L.)

*Falcon Asserts That Neudorff's Herbicidal Soaps Infringe The '156 Patent*

Another Neudorff licensee is a company named Gardens Alive!, Inc. ("Gardens Alive!"), located in Lawrenceburg, Indiana. (Wilson Decl. at ¶ 8.) Under a license with Neudorff, Gardens Alive! makes a H01 Concentrate Herbicidal Soap which it has sold under the brand name Weed-Aside™ since approximately January 2000. (*Id.* at ¶ 8 & Ex. B.)

Falcon sent a letter to Gardens Alive! in or around November 2006 asserting that Gardens Alive!'s Weed-Aside™ herbicidal soap product infringes the '156 patent. (Wilson Decl. at ¶ 9, Ex. C.)

On December 20, 2006, counsel for Neudorff, William Geary, responded in writing to Falcon's assertion of infringement. In addition to explaining why Weed Aside™ would not meet the limitations of the '156 patent, Mr. Geary also explained that, in 1998, Necessary Organics, Inc., a licensee of Neudorff, sold in the United States "a product having active ingredients identical to those of the Weed Aside™ product" which was used according to its instructions.[13] (Declaration of William C. Geary, "Geary Decl." at Ex. 1). Mr. Geary concluded:

> If you believe that the '156 patent covers the Weed Aside™ product, you must also agree that the sale in the United States of the identical product by Necessary Organics more than one year before the April 27, 2000 filing date of the '156 patent would render invalid the claims of this patent at least pursuant to 35 USC § 102(b).

(*Id.*)[14]

---

[13] He also explained that although the Necessary Organics product was a ready-to-use (RTU) formulation, one following the directions for the concentrated Weed Aside™ product would obtain and apply the same formulation as the RTU product. (Geary Decl. at Ex. 1.)

[14] Falcon has specified its infringement claims, stating that the H01 Herbicidal Soaps infringe Claims 4, 6, 8, 13, 15, and 17, of the '156 patent, which, according to Falcon, "cover the use of ammonium nonanoate . . . as the only active ingredient . . . with 0 to 0.5 wt.% or 0 to 0.1 wt. % of free fatty acid as weed killers." (Geary Decl. at Ex. 11.) As noted below, it does not matter what claims Falcon alleges are infringed because if any of them are infringed by the herbicidal soap products, they are also anticipated by the general prior use of the Herbicidal Soap products.

*Falcon Continues To Assert Infringement Against Neudorff, Neudorff Licensees, And Retailers Carrying Neudorff's H01 Herbicidal Soaps*

Over one year after this initial exchange of letters, Falcon sent a letter dated February 15, 2008, to Neudorff and to representatives of Wal-Mart Stores, Schultz Company, Gardens Alive!, and Scotts Miracle-Gro Company—all of whom sell or license the H01 Herbicidal Soaps— asserting that "all of Neudorff's licensees and their customers" are infringing the '156 patent and stating its intent to offer licenses "at reasonable terms for past infringement and future operations." (Wilson Decl. at ¶ 11(e) & Ex. D.) Yet, from November 2006 until February 2008, Neudorff and Falcon exchanged no less than a dozen letters comprising hundreds of pages of correspondence and exhibits demonstrating that Falcon had known fully by this time that, if its own infringement claim was true, then the '156 patent was invalid due to prior use under Section 102(b). Falcon even implied to a Neudorff licensee, falsely, that Neudorff was aware that it was "guilty of contributory infringement." (*Id.* at ¶ 11(d) & Ex. H.) This correspondence is discussed in relevant detail below. The full body of correspondence is attached to the Declarations of Cameron Wilson and William Geary, Esq.

### *Irreparable Harm is Accruing to Neudorff as the Result of Falcon's False Claims*

Falcon has made these demonstrably false assertions to parties with whom Neudorff has ongoing business relationships, such as Wal-Mart, Spectrum Brands, Gardens Alive!, and Scotts Miracle-Gro. Falcon has claimed that "all licensees and customers" are infringers, and, thus, has likely communicated its meritless allegations to other licensees and customers of Neudorff, and retailers of Neudorff products. (*Id.* at ¶¶ 11(e), 13, Ex. D.)

These allegations facially are untrue and have harmed Neudorff's credibility with these parties. Wal-Mart has threatened to remove the H01 Herbicidal Soaps from its shelves. (*Id.* at ¶ 11(c).) Neudorff has had to respond to letters and other inquiries to defend itself against the

assertions. (*Id.* at ¶ 13.) The purpose of Falcon's assertions is specifically to harm Neudorff's

reputation and business goodwill. The damage to these relationships, many of them long

standing, is irreparable, and would be difficult to quantify with precision. (*Id.* at ¶ 18.)

## II.    ARGUMENT

### A.    STANDARD FOR A PRELIMINARY INJUNCTION

"A decision to grant or deny a preliminary injunction is within the sound discretion of the

district court, based upon its assessment of four factors: (1) the likelihood of success on the

merits; (2) irreparable harm if the injunction is not granted; (3) the balance of hardships between

the parties; and (4) the public interest." *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1338-

39 (Fed. Cir. 2003). "These factors, taken individually, are not dispositive; rather, the district

court must weigh and measure each factor against the other factors and against the form and

magnitude of relief requested." *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed. Cir.

1988).

### B.    A PRELIMINARY INJUNCTION SHOULD ISSUE PREVENTING FALCON FROM CONTINUING ITS BAD FAITH CLAIMS OF INFRINGEMENT

#### 1.    Neudorff Has A Substantial Likelihood Of Success On The Merits Of Its Claim That The '156 Patent is Invalid As Anticipated By The Use Neudorff's Herbicidal Soap As Early As 1997

While Neudorff denies Falcon's claim that Weed-Aside™ infringes the '156

patent, Neudorff seeks only to prove that it has a substantial likelihood of success on the merits

of its assertion of invalidity.[15] For the purposes of this Motion only, Neudorff thus assumes the

truth of Falcon's contention, that the H01 Herbicidal Soap in the form of Weed-Aside™ (or any

other brand of Neudorff herbicidal soap) meets each of the limitations of the claims of the '156

---

[15] Should this matter go to trial, Neudorff would prove that the H01 Herbicidal Soaps do not infringe the '156 patent because, at the least, it does not meet the limitation that no more than "0.5 wt. % of the active ingredient is free fatty acid." *See* Claim 1 of the '156 Patent, attached as Exhibit A to the Complaint.

patent that Falcon alleges are infringed.  Nonetheless, the evidence on the question of invalidity

is straightforward:

(1) H01 Herbicidal Soap was in use in the United States prior to April 27, 1999, which is

more than one year before the filing of the '156 patent application.

(2) H01 Herbicidal Soap contained the same active ingredient when it was in use prior to

April 27, 1999 and as it is in use today.  This is true whether the pre-April 27, 1999 use was by

the Cal Poly researchers or by the purchasers of the CONCERN® brand of H01 Herbicidal Soap,

and whether the accused use today is of the Weed-Aside™ brand of H01 Herbicidal Soap or any

other licensed brand.

(3) As a result, even assuming that the H01 Herbicidal Soap as in use today infringes any

claims of the '156 patent, those claims are anticipated by the prior use of the H01 Herbicidal

Soap pursuant to 35 U.S.C. § 102(b).[16]

(a)     Standard for Anticipation By Prior Use

A patent is invalid by anticipation under 35 U.S.C. § 102(b) if an invention was "in

public use . . . in this country, more than one year prior to the date of the application for patent in

the United States." *See also Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 68-69 (1998).   Public use

includes "any use of the claimed invention by a person other than the inventor who is under no

limitation, restriction or obligation of secrecy to the inventor." *Baxter Int'l, Inc. v. Cobe Lab.,*

*Inc.*, 88 F.3d 1054, 1058 (Fed. Cir. 1996) (citing *In re Smith*, 714 F.2d 1127, 1134 (Fed. Cir.

1983)).

---

[16] Neudorff need not parse each of the claims of the '156 patent that Falcon contends are infringed by the H01 Herbicidal Soap to demonstrate that each is anticipated.  Assuming the truth of Falcon Lab's contention that each of the claims are infringed, as Neudorff does for purposes of this Motion, then each such claim is anticipated by the use of the H01 Herbicidal Soap before April 27, 1999.

Whether an invention was in public use one year before the date of the application for the patent—known in patent law parlance as "the critical date,"—within the meaning of Section 102(b) is a question of law. *Lough v. Brunswick Corp.*, 86 F.3d 1113, 1118, 1120 (Fed. Cir. 1996). To support a finding of invalidity under section 102(b) due to prior use, "the record must show that an embodiment of the patented invention was in public use . . . as defined by the statute before the critical date." *Adenta GMBH v. Orthoarm, Inc.*, 501 F.3d 1364, 1373 (Fed. Cir. 2007) (upholding declaratory judgment of invalidity where plaintiff showed that defendant patentee's invention was displayed publicly prior to the critical date). As a result, there is but a single operative fact in this instance: whether H01 Herbicidal Soap—the product Falcon accuses of infringement—was in use before April 27, 1999.

> (b)   H01 Herbicidal Soap Was Used In The United States In 1997 and 1998

Neudorff contends that H01 Herbicidal Soap was used in the United States in 1997 and 1998, well before April 27, 1999, the critical date of the '156 patent. Neudorff offers the following overwhelming evidence supporting this fact.

Dr. George Puritch, the founder and CEO of Eco-Care Technologies, Inc., ("Eco-Care")[17] states that the H01 Herbicidal Soap was provided in 1997 to researchers at Cal Poly to use in California and generate data that Neudorff could then use in its application to register the product in California. (Puritch Decl. at ¶ 15.) (California requires data of use of a herbicide in California as a precondition to registration.) The product was sprayed on nearly 20 weed species growing outdoors and was effective in killing these weeds. (*Id.*) No special confidentiality obligations were imposed. (*Id.* at ¶ 16.) This use alone is a qualifying prior use under section 102(b). *See*

---

[17] As Dr. Puritch states, Eco-Care has contracted to provide research and development services to Neudorff. (Puritch Decl. at ¶ 1.)

*Baxter Int'l*, 88 F.3d at 1058 (centrifuge in use in university lab by researchers not connected with inventor of patent-in-suit sufficient public use under § 102(b)); *see generally* Donald S. Chisum, CHISUM ON PATENTS § 3.05[2] (2002).

Similarly, Mr. Francis Addy used the H01 Herbicidal Soap on weeds in the spring of 1998 in Virginia to assess its efficacy before deciding whether his company would license the formula from Neudorff. (Addy Decl. at ¶¶ 2, 11.) Based on this use, Mr. Addy negotiated a license agreement with Neudorff in 1998 to make and sell the ready-to-use formulation of the H01 Herbicidal Soap. (*Id.* at ¶¶ 2-3.) His company branded its form of the H01 Herbicidal Soap under the name "CONCERN®." (*Id.* at ¶ 5.)

Moreover, Mr. Addy's company began selling CONCERN® in 1998, with its first sales occurring during the week of November 20, 1998, to distributors in the United States, including those in Missouri, Iowa, and Kansas. (*Id.* at ¶ 6 & Exs. E, F.) The products were sold in lawn and garden centers. (*Id.* at ¶ 8 & Ex. H.) The sales records establish that the first sales consisted of 61 cases of the 32 fl. oz. product and two cases of the 64 fl. oz. product and that these occurred during the week of November 20, 1998. (*Id.* at ¶ 6.) Then, from this date until April 16, 1999, Necessary Organics sold 1075 cases of the 32 fl. oz. product and 118 cases of the 64 fl. oz. product. (*Id.*) Both Mr. Addy and Dr. Puritch confirm that Neudorff received royalty payments for the 1998 and 1999 sales of CONCERN®. (*Id.* at ¶ 7; Puritch Decl. at ¶ 19.) Mr. Addy further states:

> The distributors I sold the product to in turn supplied retailers and I am confident based on the volume of my sales that the product was sold to consumers who used it according to the directions to kill weeds prior to April 27, 1999.

(*Id.* at ¶ 11.)

With Mr. Addy's testimony that he himself used the product on weeds and that his company sold over 1000 cases of product before the critical date, there will be no genuine

dispute that the product was in use during this time. This further confirms the invalidity of Falcon's '156 patent.

Under 35 U.S.C. § 102(b), if Neudorff's H01 Herbicidal Soap (whether sold under the brand name Weed-Aside™ or any other licensed brand) meets the claimed method for controlling undesired vegetation of the '156 patent today, then the patent is invalid as anticipated by the use of Neudorff's H01 Herbicidal Soap (sold under the brand name CONCERN®). The method for controlling undesired vegetation using Neudorff's H01 Herbicidal Soaps today is identical to that in use in the United States in 1998, more than one year before the '156 patent application was filed. *See Lough*, 86 F.3d at 1122 (holding that a jury finding of no anticipation should have been reversed as a matter of law where a patentee's prototypes of the invention—an upper seal assembly in boat motors—were installed on his own and other's boats prior to the patent's critical date, thus anticipating the patent by prior use under section 102(b).)[18]

  (c) <u>H01 Herbicidal Soap, As Sold And Used In 1997 And 1998, Was Comprised Of The Same Active Ingredient As The H01 Herbicidal Soap Sold And Used Today</u>

H01 Herbicidal Soap is registered with the EPA. In the EPA registration materials, filed in 1998, Neudorff disclosed that ammonium nonanoate is the active ingredient of H01 Herbicidal Soap. The H01 Herbicidal Soap's formulation registered with the EPA has never been changed as far as active ingredients are concerned. (Wilson Decl. at ¶¶ 12, 26; Puritch Decl. at ¶ 14.) Thus, H01 Herbicidal Soap's active ingredient is the same today as it was in 1998. This proof, alone, demonstrates the continuity of the active ingredient of the H01 Herbicidal Soap from 1998 until the present.

---

[18] This is true for any of the claims in the '156 patent that Falcon identifies as infringed by the H01 Herbicidal Soaps. If the herbicidal soap products infringe dependent claim 4, for example, their 1997 use in the United States, for example, anticipates claim 4.

In an abundance of caution, Neudorff submits even further proof that H01 Herbicidal Soap is the same today in relevant respects as it was prior to the critical date. Mr. Addy, who also has knowledge of the use and composition of H01 Herbicidal Soap, sets forth that, pursuant to the license agreement between Necessary Organics and Neudorff, Neudorff provided the manufacturing specification for the H01 Herbicidal Soap, which included a list of ingredients and a method to manufacture it. (Addy Decl. at ¶ 10.) His company branded its form of the H01 Herbicidal Soap under the name "CONCERN®," which, as Mr. Addy states, was "identical to the H01 herbicidal soap" at least because Necessary Organics "manufactured the product exactly to the specification" provided by Neudorff. (*Id.* at ¶¶ 4, 5.) As such, Mr. Addy confirms that CONCERN® had as its active ingredient the same ammoniated soap of fatty acids as the H01 Herbicidal Soap. (*Id.*) Attached to his Declaration is a form that Necessary Organics caused to be submitted to the EPA that identifies that in 1998 "H01 RTU Herbicidal Soap" and "Concern Fast Acting Weed Killer Ready to Use" were the same registered pesticide product. (*Id.* at ¶ 9, Ex. I.)[19]

Dr. Puritch corroborates Mr. Wilson's and Mr. Addy's testimony, stating under oath that the H01 Herbicidal Soap, whether in the form of CONCERN® or Weed-Aside™, was made in 1998 with the same beginning materials to form the same active ingredient disclosed to the EPA as is the case today. (Puritch Decl. at ¶¶ 4, 14.) As further evidence, Dr. Puritch has submitted with his Declaration numerous documents demonstrating this very fact. (*Id.* at ¶¶ 9-12, 20.)[20]

---

[19] Mr. Addy authenticated all of the documents referenced in his Declaration.

[20] These specific documents include: (1) Neudorff's letter applying for registration with the EPA (Ex. C); (2) Neudorff's "Statement of Formula," also submitted to the EPA (Ex. D); (3) Neudorff's Confidential Statement of Formula, also submitted to the EPA (Ex. E); (4) the H01 Herbicidal Soaps label (Ex. F); (5) the EPA's "Product Chemistry Review" (Ex. G); Neudorff's letter dated November 4, 1998, to the California EPA (Ex. J). Each of these documents is appended to Dr. Puritch's Declaration.

Lest there be any further question that H01 Herbicidal Soap contains the same active ingredient today as it did in 1998, even the documents appended by Falcon to its correspondence with Neudorff support this fact, including the CONCERN® MSDS (with a 1998 effective date) and Neudorff's January 29, 1998 EPA registration letter. (*See* Geary Decl. at Exs. 6, 11.) The latter states quite plainly that the "sole active ingredient" of the H01 Herbicidal Soap product is "ammonia nonanoate soap, which is ammoniated soap of fatty acids." *Id.* at Ex. 6.[21]

There is no genuine dispute that Neudorff's Herbicidal Soap as in use in 1998, under the brand name of CONCERN®, and as in use today, whether under the brand name of Weed-Aside™ or any other brand are the same product in all respects relevant to the Motion.

**2.    Neudorff Will Continue to Suffer Irreparable Harm If The Injunction Does Not Issue**

The strong likelihood of success on the merits is supported by a clear showing that Neudorff has suffered and will suffer irreparable harm.

Falcon has gone directly to Neudorff's licensees and customers, and to a retailer carrying H01 Herbicidal Soaps, to assert infringement. These parties include Wal-Mart, Spectrum Brands, Gardens Alive!, and Scotts Miracle-Gro. Falcon likely has communicated its meritless allegations to others who are licensees or customers of Neudorff, and retailers of Neudorff products. Wal-Mart has threatened to remove the H01 Herbicidal Soaps from its shelves if

---

[21] If Falcon were to argue that Neudorff changed its active ingredient because the H01 Herbicidal Soaps' MSDS's and labels list only the more general term "ammoniated soaps of fatty acids" as the active ingredient instead of the more specific term "ammonium nonanoate," this contention would be false. First, as both Dr. Puritch and Mr. Wilson make clear in their Declarations and supporting documents, H01 Herbicidal Soaps' active ingredient has been ammonium nonanoate from its registration with the EPA in 1998 until today and has never been changed. If Falcon were to argue that it was somehow inappropriate for Neudorff to use the more general term on its label, this contention would also be false. There is nothing misleading in using the more general label "ammoniated soap of fatty acids" where the specific compound is ammonium nonanoate. As Dr. Puritch attests, those familiar with the chemistry of pesticides in the context of herbicidal soaps would know that the term "ammoniated soap of fatty acids" is a general term that includes a number of soaps made from certain fatty acids, and that ammonium nonanoate is one such soap. (Puritch Decl. at ¶ 5, & Ex. B.) Reviewing the EPA's pesticide registration notice easily confirms this, and the EPA expressly allows use of the more general term. (*Id.*)

certain further assurances are not provided, and other parties have also sought assurances from Neudorff that the H01 Herbicidal Soaps do not infringe the patent. (*See* Wilson Decl. at ¶¶ 11(c), 15 & Ex. G.)

Falcon's assertions are untrue and have harmed Neudorff's credibility with these parties. Further, Falcon Lab has interfered, and if allowed to do so will continue to interfere, with Neudorff's prospective and advantageous business relationships with its actual or prospective licensees and customers, and with actual or prospective retailers of its products. The damage to these relationships, many of them of long standing, is irreparable, and would be difficult to quantify with precision.

The full extent to which Neudorff's business relationships have been harmed is difficult to calculate at this time, especially while the full extent of Falcon's efforts are yet unknown. Under these circumstances, Neudorff has shown it is suffering irreparable harm. "[T]he loss of market share and business relationships may independently constitute irreparable harm." *Schawbel Corp. v. Conair Corp.*, 122 F. Supp.2d 71, 83-84 (D. Mass. 2000) (Saris, J.) (citation omitted) (granting preliminary injunction).

### 3.    The Balance of Harms Favors Neudorff

Neudorff has presented compelling evidence that the '156 patent is invalid and of an immediate threat of irreparable harm. Falcon, by contrast, will suffer no legally cognizable harm if the requested injunction issues because it does not have an objectively supportable patent right. Falcon will simply be prevented from knowingly making untrue statements in bad faith to coerce "royalty" payments from Neudorff and its business partners. Further, Falcon, if it were to establish the validity of its patent, presumably could quantify any damages it claims are due from Neudorff. The balance of hardships thus favors granting the preliminary injunction.

Further, Falcon has targeted Neudorff's customers without notifying Neudorff, evidencing that it has the will and ability, *ex parte*, to allege infringement and demand that the customer reach a license deal with Falcon without providing Neudorff with any opportunity to respond.

### 4.    The Public Interest Favors Neudorff

There is no public interest in the enforcement of an invalid patent.

### 5.    Neudorff Is Entitled To An Injunction Restricting Falcon's Assertions Of Infringement

While a patentee who has a good faith belief that its patent is infringed may notify infringers of such, a patentee whose claims of infringement are made in bad faith has no privilege to do so. *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1374-75 (Fed. Cir. 2004).

Falcon had full knowledge that the H01 Herbicidal Soaps do not infringe the '156 patent because their use in the United States before April 27, 1999 would invalidate the '156 patent, and yet continued to assert its baseless infringement claim to Neudorff licensees, retailers carrying its products, and even third parties with no apparent connection to this dispute. It also falsely stated that Neudorff is aware of its infringement (falsely implying that Neudorff concedes infringement). Bad faith is shown by demonstrating that the patentee's claim of infringement is objectively baseless—either because the patent is obviously invalid or not infringed—and also takes into account subjective factors suggesting ulterior motives. *Id.* at 1375. Where a patentee knows that a patent is invalid, unenforceable, or not infringed, yet represents the contrary to the marketplace, bad faith may inferred. *Zenith Elect. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1353 (Fed. Cir. 1999). A full description Falcon's prolix letters evidencing bad faith is not practical

here,[22] but a synopsis is attached as <u>Exhibit A</u>.  In brief, Falcon's bad faith is amply

demonstrated by these facts:

(1)    Falcon knew or was willfully blind to the facts that, if Neudorff's H01 Herbicidal

Soap in the brand of Weed-Aside™ was indeed an infringing product, as Falcon alleged, then the

'156 patent would be invalid because the same product—the H01 Herbicidal Soap in the brand

of CONCERN®—was in use in the United States in 1998 prior to the critical date of the patent-

in-suit. *See Magnetic Eng'g & Mfg. Co. v. Dings Mfg. Co.*, 178 F.2d 866 (2d Cir. 1950)

(evidence that patentee believed patent was not valuable supported finding that patentee lacked

good faith in alleging that patents were valid and intimating possible suit for infringement).

Neudorff responded to numerous inquiries made by counsel for Falcon and painstakingly

documented the myriad proof that the H01 Herbicidal Soap products Falcon accuses of

infringement are the same in all relevant respects to the 1998 CONCERN® brand of H01

Herbicidal Soap product.

(a)    The documents submitted by Neudorff to the EPA in 1998 disclosed the

active ingredient of the H01 Herbicidal Soaps as ammonium nonanoate (also known as

ammonium pelargonate) "as the sole active ingredient."  This is notwithstanding the fact that

Neudorff and its licensees used the more general term on their H01 Herbicidal Soap labels,

ammoniated soaps of fatty acids.  Use of the more general term was in accord with EPA policy

and was consistent with Neudorff's EPA-approved label.  (Puritch Decl. at ¶ 5, Ex. B.)

---

[22] Moreover, the letters are far afield from the type of cease-and-desist communications that may be
protected under the patent laws.  They are for the most part incoherent and are replete with non sequiturs, frolics and
detours, and mischaracterizations that eclipse whatever legitimate notice purpose under 35 U.S.C. § 287 may have
been buried therein.

(b)     Because the CONCERN® product shares the same EPA registration as the

H01 RTU Herbicidal Soap (EPA Reg. No. 67702-7), it had the same formulation, including

active ingredient, as the H01 RTU Herbicidal Soap.

(c)     A 1998 Neudorff letter to the California EPA confirms that CONCERN®

was the same product and had the same EPA registration as the H01 Herbicidal Soaps, stating

"Concern Fast Acting Weed Killer, EPA Reg. 67702-7-50932" is "identical in composition and

labeling (with certain minor exceptions allowed by law) to Neudorff's products . . . H01 RTU

Herbicidal Soap, EPA Reg. 67702-7."

(d)     The MSDS's, which were attached to a May 2, 2007 letter from Falcon's

counsel, identify the H01 Herbicidal Soaps' active ingredient as "ammoniated soaps of fatty

acids," which is exactly the same active ingredient listed on the label for the CONCERN®

product and the other H01 Herbicidal Soap brands marketed by other licensees, such as the

Garden Safe Brand Weed and Grass Killer (Schultz Company), CONCERN® (Woodstream

Corporation), and Weed-Aside™ (Gardens Alive!).  Each MSDS references the same EPA

Registration Number (except for the suffix, which is a number specific to the Distributor

company).  This EPA Registration Number is the one assigned to H01 Herbicidal Soap.  The

1998 CONCERN® product also references the same EPA Registration Number (except for the

suffix).

(e)     The fact that Falcon had notice of the sale of CONCERN® as of 1998 is

also unassailable:  spreadsheets containing the item numbers for the CONCERN® 32 oz. and 64

oz. products proved sales during the week of November 20, 1998, and that numerous cases of the

product were sold from then up until April 27, 1999.[23] Distributor lists, price lists, product

specifications, marketing materials, and a fact sheet for the CONCERN® brand of H01

Herbicidal Soap contain contemporaneous dates and further evidence the 1998 sale and use of

these products.

(2)     With knowledge of these facts, Falcon nevertheless sent its February 15, 2008

letter alleging infringement of the '156 patent by "all of Neudorff's licensees and their

customers." (Wilson Decl. at Ex. D.)

(3)     Falcon sent the February 15, 2008 letter *14 months* after Neudorff first informed

Falcon that its claim was baseless, and after Neudorff had *provided all relevant information*

*requested* by Falcon demonstrating that the '156 patent would be invalidated by the 1998 sale of

the CONCERN® brand of H01 Herbicidal Soap.

(4)     The February 15, 2008 letter was, at the least, the *fourth* such letter to Gardens

Alive!, the *second* such letter to Wal-Mart, the *second* such letter to Scotts Miracle-Gro, and the

first letter to Dixie Chemical Co., a third party that, as far as Neudorff can tell, *had no knowledge*

*of the matter* up to that point. *See Betmar Hats, Inc. v. Young America Hats, Inc.*, 116 F.2d 956,

957 (2d Cir. 1941) ("persistent threats to the trade" without follow through cited as supporting

injunction).

(5)     Because Falcon took the dispute straight to Neudorff's customers and in some

instances did not provide copies of its letters to Neudorff, Neudorff believes that Falcon may

have communicated its baseless infringement claims to others that Neudorff has yet to discover.

(6)     Falcon has *never had, and now has no intent, to bring a lawsuit against Neudorff*

*for infringement* to settle the matter in the proper forum. Instead, it engaged Neudorff in a

---

[23] Falcon's request for a sales spreadsheet from Neudorff to determine Neudorff's sales since the date of the '156 patent but its refusal to accept similar information to prove the 1998 sales of CONCERN® also smacks of bad faith.

lengthy and costly letter writing campaign during which Falcon doggedly and without justification refused to accept the overwhelming proof of the invalidity of the '156 patent while it demanded that Neudorff's licensees reach a licensing arrangement and pay royalties to Falcon. *See Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 710 (Fed. Cir. 1992) (injunction may be issued where patentee has no intention of filing suit yet alleges violations of rights); *Betmar Hats*, 116 F.2d at 957 (failure to assert patent rights in judicial forum "indicated a lack of good faith on the part of the defendants").

(7) Falcon sent a letter to the President of Lawn and Garden Products, dated November 5, 2007, alleging that Lawn and Garden's sales of the herbicidal soap (under license with Neudorff) infringe the '156 patent, and demanding that it cease all sales, enter into a license with Falcon Lab under the '156 patent, and provide an accounting of sales. In this letter, Falcon even falsely stated that Neudorff is aware that it is "guilty of contributory infringement." (Wilson Decl. at Ex. H.) This falsely implies that Neudorff has acknowledged it is an infringer.

Falcon's conduct conclusively demonstrates its willful ignoring of the facts and its bad faith. Falcon has represented to the marketplace that the '156 patent is valid and infringed while knowing that the patent is invalid, unenforceable, or not infringed. In such a circumstance, bad faith may be inferred and the Court should do so here, at least for the purposes of issuing the preliminary injunction. *See Zenith*, 182 F.3d at 1353. Falcon also has resorted to falsely representing that Neudorff is aware or has acknowledged that it is infringing the '156 patent when nothing could be further from the truth. In these circumstances, Falcon's notice of patent rights was not properly given under federal patent law and must be enjoined.

## III.  CONCLUSION

For all the foregoing reasons, Neudorff requests that this Court issue a preliminary injunction in the form submitted with Neudorff's Motion for Preliminary Injunction.

Dated: June _5_, 2008

W. NEUDORFF GmbH KG,

By its attorneys,

John C. Phillips, Jr., Esquire (Bar ID 110)
Phillips, Goldman & Spence, P.A.
Pennsylvania Ave. and Broom Street
1200 North Broom Street
Wilmington, DE 19806
Phone: (302) 655-4200

Of Counsel:
Stephen J. Brake
Rachel J. Sherman
Nutter McClennen & Fish, LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
T:      617-439-2000
F:      617-310-9000

1724687.6