UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| W. Neudorff GmbH KG, | ) | Civil Action No. 08-C-333 |
| Plaintiff, | ) | |
| v. | ) | DECLARATION OF |
| Falcon Lab LLC | ) | CAMERON WILSON |
| Defendant. | ) | |

I, Cameron Wilson, hereby depose and state as follows:

1.　　I am the Vice President of Operations and New Business for Neudorff North America, located in Brentwood Bay, British Columbia. Neudorff North America is a subsidiary of Neudorff GmbH KG ("Neudorff"), and conducts Neudorff's business in North America. Neudorff is a manufacturer and supplier of natural and organic plant protection products. Its administration and production headquarters are located in Emmerthal, Germany. I have personal knowledge of the matters stated herein.

2.　　As Vice President of Operations and New Business, I am responsible to direct and manage Neudorff's North America supply chain and business development activities, including staffing, budgeting, field trials, and various intellectual property matters. I am also involved in Neudorff's efforts to obtain its U.S. pesticide registrations. Neudorff has entered into an agreement with Eco-Care Technologies, Inc. ("Eco-Care"), pursuant to which Eco-Care performs research and development work. As part of my duties, I coordinate the work of Eco-Care with Neudorff's North American operations.

3.    Formerly, I was employed by Eco-Care as a Research Scientist where I worked on a team that researched and developed natural-based fungicide and herbicide inventions. In this capacity, I co-developed several products, including fatty acid/soap-based herbicides.

4.    I am familiar with Neudorff's "H01 RTU Herbicidal Soap" and "H01 Concentrate Herbicidal Soap" products (together "H01 Herbicidal Soaps"). The H01 Herbicidal Soaps were first sold in the United States in 1998, and are still sold today at lawn and garden centers, Wal-Mart, and other retailers.

5.    During 1997, Neudorff conducted a field test to determine the effectiveness of the H01 Herbicidal Soaps in California. Neudorff arranged for scientists at California Polytechnic University at San Luis Obispo to use the H01 Herbicidal Soaps during the spring and winter of 1997 and to gather the data. This field test demonstrated that the H01 Herbicidal Soap was effective at killing the weed species targeted.

6.    Neudorff has followed a practice of licensing its H01 Herbicidal Soaps to other companies to manufacture and sell. By written agreement in 1998, Neudorff granted a license to Necessary Organics, Inc., of New Castle, Virginia, the right to make and sell the Neudorff H01 RTU Herbicidal Soap (the "Necessary Organics License Agreement"). See License Agreement, Annex 1, attached as Exhibit A. The agreement required Necessary Organics to ensure that the licensed product meets Neudorff specifications and that the product complies with the registered EPA master label. Id. at § 7. Necessary Organics sold the product under the brand name, CONCERN®. Necessary Organics is no longer in business, but the CONCERN® product was purchased by another corporation and today it is sold in the marketplace by Woodstream Corp. Woodstream pays royalties to Neudorff based on its sales of CONCERN®.

7.    Pursuant to the licensing arrangement, Neudorff provided Necessary Organics with the manufacturing specifications to make and package the product.  The specifications disclosed the product's ingredients and method of manufacture, among other information.  The ingredients include pelargonic acid and ammonium hydroxide.  These ingredients combine to make a soap known as ammonium nonanoate, the active ingredient[1] of the H01 Herbicidal Soap. Ammonium nonanoate is an ammonium salt that falls within the term approved by the EPA, "ammoniated soap of fatty acids," to identify certain ammonium salts.  It is this term that is used on the label for the products.

8.    In February 1999, Neudorff provided a license to Gardens Alive!, Inc. ("Gardens Alive!"), located in Lawrenceburg, Indiana, to make and sell the H01 Herbicidal Soap (concentrate version).  See Letter of Revision of Neudorff/Gardens Alive Agreement of December 6, 1996, Annex 1HPY, attached as Exhibit B.  Gardens Alive! has been selling this product under its own brand name, Weed-Aside™, since approximately January 2000.  Pursuant to the licensing arrangement, Neudorff provided Gardens Alive! with the manufacturing specifications to make and package the product.  These manufacturing specifications include the use of pelargonic acid and ammonium hydroxide which, in combination, make the active ingredient, ammonium nonanoate.  The manufacturing specifications provided by Neudorff to Necessary Organics also included the use of pelargonic acid and ammonium hydroxide which combined to form the same active ingredient, ammonium nonanoate.  Ammonium nonanoate was present in different concentrations in Necessary Organics's and Gardens Alive!'s products, since one was a ready-to-use version and one was a concentrate version.

---

[1] I use the phrase "active ingredient" to mean that the ingredient is biologically active—that is, it is herbicidal either itself or in combination with another active ingredient.  I do not mean to express any opinion of the meaning of "active ingredient" as that term is used in the '156 patent.

9.     In or around November 2006, Falcon Lab sent a letter to Gardens Alive! charging that Gardens Alive!'s Weed-Aside™ herbicidal soap product infringes U.S. Patent 6,323,156 (the '156 patent)  (See undated letter sent in or around November 2006, by Falcon Lab to Gardens Alive!, attached as Exhibit C.)  Weed-Aside™ was at that time, and continues to be, sold under a license with Neudorff.  Gardens Alive! notified Neudorff of the allegation.

10.     Falcon Lab has continued to contact and allege infringement to Neudorff, its licensees, and Wal-Mart Stores (which carries a brand of H01 Herbicidal Soap).  Falcon Lab has essentially admitted in its letters that these contacts have been made with the goal to extract royalty payments.  (See February 15, 2008 letter from counsel for Falcon Lab to counsel for Neudorff, attached as Exhibit D.) ("By copies of this letter to Neudorff management, and the infringers whose lawyers or representatives have communicated with me, Falcon is offering licenses under its '156 patent at reasonable terms for past infringement and future operations.").

11.     Specifically, Neudorff is aware of the following allegations made by Falcon Lab to Neudorff licensees and at least one retailer carrying H01 Herbicidal Soap:

(a)     By letter dated January 29, 2007, addressed to counsel for Neudorff and copied to Gardens Alive! and Woodstream Corp., Falcon asserted infringement of the '156 patent by Gardens Alive! and Woodstream Corp., and demanded that they stop selling their herbicidal soaps (under the brand names Weed-Aside™ and CONCERN® Fast-Acting Weed Killer, respectively) unless they obtain a license from Falcon Lab.  Gardens Alive! and Woodstream Corp. sell these herbicidal soap products under licenses with Neudorff.  (Exhibit E.)

(b)     By e-mail of April 2, 2007, addressed to Debbie Posey, an employee of Gardens Alive!, the President of Falcon Lab, Joan Smiley, asserted that

Gardens Alive! "is guility [sic] of, namely, 'inducement to infringe' the '156 patent" and

threatened a lawsuit for infringement in which Smiley implied Gardens Alive! would be

liable for treble damages.  (Exhibit F.)

        (c)     By letter dated October 23, 2007, addressed to the President and

CEO of Wal-Mart Stores, Inc., and copied to Spectrum Brands, Inc., Falcon Lab alleged

that Wal-Mart's sales of Garden Safe® brand Weed and Grass Killer, supplied by

Spectrum Brands, infringe the '156 patent.  Garden Safe® brand Weed and Grass Killer is

a herbicidal soap sold by Spectrum Brands under license with Neudorff.  Falcon Lab also

demanded that Wal-Mart cease all sales of the Garden Safe® brand Weed and Grass

Killer.  (Exhibit G.)  Falcon Lab's assertions has harmed Neudorff's goodwill in the eyes

of both Wal-Mart and Spectrum Brands, and has led counsel for Wal-Mart to demand

from Spectrum Brands, among other things, a reaffirmation of an indemnity obligation

and to state that its product will be removed from Wal-Mart's shelves if Spectrum Brands

did not provide certain further assurances.

        (d)     By letter dated November 5, 2007, addressed to the President of

Lawn and Garden Products, Falcon Lab alleged that sales of Lawn and Garden's

herbicidal soap infringe the '156 patent.  Falcon Lab also demanded that Lawn and

Garden cease all sales of its herbicidal soap, enter into a license with Falcon Lab under

the '156 patent, and provide an accounting of all sales of the product since a certain date.

Lawn and Garden Products sells its herbicidal soap under license with Neudorff.  (Exhibit

H.)

        (e)     By letter dated February 15, 2008, addressed to counsel for

Neudorff and copied to counsel for Scotts Miracle-Gro Company, Falcon asserted that

"all of Neudorff's licensees and their customers" are infringing the '156 patent, and demanded that Scotts Miracle-Gro Company provide certain information regarding a product sold under license with Neudorff.  Falcon Lab copied the letter to Dixie Chemical Co., Schultz Company, Gardens Alive!, and Wal-Mart.  The latter three of these companies distribute H01 Herbicidal Soap products under license with Neudorff or carry it in a retail setting.  (Exhibit D.)

12.    Falcon Lab has also falsely accused or implied without basis that Neudorff has deceived the EPA by altering the identification of the active ingredients in its products. Neudorff has not changed the active ingredients of the H01 Herbicidal Soaps formulations since their initial registrations.  If it did, it would have had to apply for an amendment to its confidential statement of formulation with the EPA, which it has not done.  The H01 Herbicidal Soaps have been made as specified, with ammonium pelargonate as the active ingredient, since at least 1998.

13.    Falcon Lab has asserted that all of Neudorff's licensees and customers are infringing the '156 patent.  It has threatened to contact other Neudorff licensees to notify them of Falcon Lab's infringement claims in an attempt to obtain royalty payments from them.  On information and belief, Falcon Lab has communicated with other Neudorff licensees and customers than those identified in ¶ 11 above.  Neudorff has had to respond to these letters and other inquiries in defense of these assertions.

14.    Neudorff has informed Falcon Lab that Neudorff considers its communications to Wal-Mart Stores and Spectrum Brands, Inc. to constitute intentional interference with contractual relations and/or intentional interference with advantageous business relations. Neudorff has explained that the '156 patent is not infringed.  It has also explained that the

CONCERN® and the Weed-Aside™ products—both H01 Herbicidal Soaps—have the same active ingredient. Further, it has explained that, even accepting for the sake of argument only that the H01 Herbicidal Soap infringes the '156 patent, then the 1998 sale of CONCERN® would anticipate the '156 patent. Despite these warnings, Falcon Lab has continued to communicate with these parties, thereby interfering with Neudorff's business relationships.

15.    Falcon Lab's actions have damaged, and continue to damage, Neudorff. Falcon Lab's allegations that Neudorff is an infringer and has admitted its infringement has harmed its goodwill, business relationships, and reputation. Falcon Lab has communicated its meritless allegations to Wal-Mart, Spectrum Brands, Gardens Alive!, and Scotts Miracle-Gro. On information and belief, it has communicated its meritless allegations to others who are licensees or customers of Neudorff, and retailers of Neudorff products. As a result, these parties have sought assurances from Neudorff that the H01 Herbicidal Soaps do not infringe the patent. Wal-Mart has threatened to remove the H01 Herbicidal Soaps from its shelves if certain further assurances are not provided.

16.    Falcon Lab's allegations have harmed Neudorff's credibility with these parties. Also at risk are Neudorff's relationships with third parties who license Neudorff products, who have not yet contacted by Falcon Lab. Certain of Neudorff's licenses are nonexclusive, and Neudorff's efforts to negotiate with third parties for license arrangements will likely be harmed by Falcon Lab's false and bad faith accusations.

17.    Thus, Falcon Lab has interfered, and if unchecked will continue to interfere, with Neudorff's prospective and advantageous business relationships with its actual or prospective licensees and customers, and with actual or prospective retailers of its products. The damage to

these relationships, many of them long standing, is irreparable, and would be difficult to quantify with precision.

     18.     The documents that I have attached to my Declaration as <u>Exhibits A</u> through <u>H</u> are documents that have been maintained by or on behalf of Neudorff North America as a part of its regularly conducted business activities.  As Vice President of Operations and New Business for Neudorff North America, I have personal knowledge of the existence and maintenance of these documents.  The documents were created on or near the dates contained on them.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Signed this 28th day of May, 2008.

_____

Cameron Wilson

# EXHIBIT A



## License Agreement

This License Agreement is made and entered into by and between the firm of W. Neudorff GmbH KG, represented by its managing directors, Dr. Ekkehard Lohmann and Hans Joachim Lohmann, An der Mühle 3, 31860 Emmerthal, Federal Republic of Germany (hereinafter referred to as "Neudorff "), and Necessary Organics, Inc., a Virginia corporation with offices located at One Nature's Way, New Castle, Virginia 24127-0305, USA (hereinafter referred to as "Licensee").

WHEREAS, Neudorff develops and produces products for organic gardening in Germany and has developed and owns certain trade secrets and proprietary and confidential know-how for the manufacture and use of these products, which trade secrets and know-how have been commercially utilized by Neudorff for a long period of time in Germany,

WHEREAS, Licensee desires a license from Neudorff under these trade secrets and know-how to manufacture and sell certain of these products in the United States market.

WHEREAS, Neudorff is willing to disclose such trade secrets and know-how to Licensee for use in manufacturing such products in such geographical area, on the terms and subject to the conditions set froth herein.

NOW, THEREFORE, in consideration of the foregoing promises and the mutual covenants and agreements contained herein, the parties hereto agree as follows:

1.     DEFINITIONS.     For purposes of this Agreement, the following terms shall have the following meanings and shall include the plural as well as the singular:

1.1   "Products" shall mean the products identified in Annex 1 attached hereto.  Further products may be added to Annex 1 upon mutual agreement by the parties.

1.2   "Know-How" shall mean any trade secret, technical fact, know-how, data (in the form of reports, drawings, designs, manufacturing process specifications, quality control, inspection and testing procedures, methods, techniques, processes, and the like), used commercially by Neudorff in the manufacturing, processing and inspecting of the Products in the regular course of its business development, and in existence on the date and after this Agreement becomes effective.



Necessary Organics - Neudorff Agreement 1998
June 24, 1998
Page 2/12



REDACTED



Necessary Organics - Neudorff Agreement 1998
June 24, 1998
Page 3/12





Necessary Organics - Neudorff Agreement 1998
June 24, 1998
Page 4/12



6.    ROYALTY,

6.1   With respect to each Product(s) sold, Licensee shall pay to
Neudorff a royalty in the amount of Redacted percent of the Total Net Sales
Dollars received by Licensee as identified in Annex 3.





Necessary Organics - Neudorff Agreement 1998
June 24, 1998
Page 5/12

REDACTED

7.    QUALITY CONTROL AND GOVERNMENTAL APPROVAL.

7.1    All Products sold by Licensee shall be manufactured in
accordance, with US. regulations thereto and shall be in conformance with
quality specifications agreed upon by the parties. The quality of all Products
sold shall at least correspond with the quality of samples supplied to
Licensee by Neudorff, to be tested by Licensee at Licensee's expense. For
audit purposes, Neudorff may request a reasonable number of sample
Products for testing by Neudorff at Neudorff's expense, such request not to
exceed twice in each calendar year.



7.6    Prior to sale, Licensee shall submit all product specific labels to
Neudorff to ensure that they comply with the registered EPA master label.





Necessary Organics - Neudorff Agreement 1998
June 24, 1998
Page 6/12
If Licensee wishes to alter the approved label, then it will first obtain Neudorff's approval and then revise the label at its own expense and on its own responsibility.





Necessary Organics - Neudorff Agreement 1998
June 24, 1998
Page 7/12





Necessary Organics - Neudorff Agreement 1998
June 24, 1998
Page 8/12





Necessary Organics - Neudorff Agreement 1998
June 24, 1998
Page 9/12





Necessary Organics – Neudorff Agreement 1998
June 24, 1998
Page 10/12



Necessary Organics -- Neudorff Agreement.1998
June 24, 1998
Page 11/12





Necessary Organics - Neudorff Agreement 1998
June 24, 1998
Page 12/12
IN WITNESS WHEREOF, the parties hereto have caused this Agreement to
be executed in the manner appropriate to each,

Necessary Organics, Inc.

By: _____

Title: _____


W. Neudorff GmbH KG

By: _____

Title: _____

## ANNEX 1
### To The License Agreement 1998.

between

W. Neudorff GmbH KG

and

Necessary Organics Inc.

Product under the agreement shall be the following products as described and with their registration numbers, where applicable, as follows:

1. *Redacted*

2. *Redacted*

3. *Redacted*

4. Herbicidal Soap (H01) RTU

The Licensing period for *Redacted* and H01 herbicide shall have a duration of 5 years, beginning with the date of this annex, and then will be extended for another three years, unless one of the parties terminates the Agreement with at least a six month notice.

Dated: *July 80, 1998*                    *August 10, 1998*



**ANNEX 2**
To The License Agreement 1998.

between

W. Neudorff GmbH KG

and

Necessary Organics Inc.

According to §5.2 of the Agreement, the Licensee shall sell a minimum quantity, or pay minimum royalties thereon, of Neudorff's Redacted Redacted · Herbicidal Soap RTU (HO1) listed under Annex 1 as follows:

Annual Sales For First Seven Years ($ "000):



3.     Herbicidal Soap (HO1) RTU

| 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|------|------|------|------|------|------|
| Redacted | | Redacted | | Redacted | |

**ANNEX 3**
To The License Agreement 1998.

between

W. Neudorff GmbH KG

and

Necessary Organics Inc.

According to Section 6.0 of the Agreement, the Licensee shall pay Neudorff royalties for each product under Annex 1, based on net sales of the Licensee to their customers.  Freight, recalls and take-backs of products will not reduce the royalties and the royalties will apply to the net selling price regardless of the unit sold, either RTU or concentrate.  The royalty schedules are as follows:

1   Redacted                                          Redacted

2   Redacted                                          Redacted

3.  Redacted                                          Redacted

4       Herbicidal Soap (H01) RTU                     Redacted

# EXHIBIT B

21/11/2006  13:37    +49-5155-624249         NEUDORFF BETR.LEIT.              S.    01/08

**NEUDORFF**
Freude am
naturgemäßen Gärtnern

W. Neudorff GmbH KG · Postfach 1209 · 31857 Emmerthal · Germany

**Neudorff North America**
Attn. Mr. Cam Wilson

From:
Dr. Burkhard Mielke
Tel. 05155/624-102
Fax 05155/624-249
Emmerthal, 21.11.2006

Fax-No. +1-250-652-5788
Pages:  8

**Gardens Alive HO1 Concentrate Agreement**

Cam,

Please find attached a copy of the requested agreement.

Best regards

Dr. Burkhard Mielke

attachment

Vermarkung: 31860 Emmerthal          Verkauf Nord 0 51 55/62 41 42       Volksbank Hameln-Stadthagen eG          HypoVereinsbank Hameln
An der Mühle 3 · Germany                Verkauf Ost 0 51 55/62 41 44        Kto. 100 480 800 · BLZ 254 621 60        Kto. 024 777 830 · BLZ 200 300 00
Telefon +49 (0) 51 55/62 4-0           Verkauf Südwest 0 51 55/62 41 45    Sparkasse Weserbergland Hameln           Commerzbank Hameln
Fax +49 (0) 51 55/60 10                 Verkauf Südost 0 51 55/62 41 43     Kto. 5 000 013 · BLZ 254 501 10          Kto. 760 460 600 · BLZ 254 400 47
eMail info@neudorff.de                  Fax Verkauf 62 42 46

W. Neudorff GmbH KG Emmerthal · Handelsregister Hannover HRA 100082 · Steuer-Nr. 22/201/15709 · USt-IdNr. DE 115451071
Pershalt Gesellsch. W. Neudorff Verwaltungsgesellschaft mbH Emmerthal · Handelsregister Hannover HRB 100251 · Geschäftsführer: H-M. Lohmann J. Lohmann Dr. B. Mielke

21/11/2006  13:37   +49-5155-624249          NEUDORFF BETR.LEIT.              S.    02/08

⟶ *Fread*

*Dr. Puestch*
*To. Ludwig*
*H. Meyer* ✓3x

**NEUDORFF** ®
*naturgemäß gärtnern*

*W. Neudorff GmbH KG · Postfach 1209 · 31857 Emmerthal*

Gardens Alive! Inc.                                 Our ref.:
attn. Mr N. Kinerk                                  Mr Meyer/Lu
5100 Schenley Place                                 Phone 05155/624-101

Lawrenceburg, Indiana 47025                         Emmerthal, February 18,99
USA

Dear Niles,

enclosed please find the new letter of revision for the herbicide exclusive for direct mailing,
as we talked before.

Please send us one copy back, signed by you.

With kind regards
W. NEUDORFF GMBH KG

*Detlef*                                  *J. Ludwig*
Detlef                                    i. A. J. Ludwig

Verwaltung: 31860 Emmerthal       Verkauf Nord 051 55 / 624 42    Volksbank Bad Pyrmont - Emmerthal eG    BHF-Bank Hannover
An der Mühle 3  Tel · 051 55 / 624-0   Verkauf Ost 051 55 / 624 44     Kto. 189 450 800 · BLZ 254 631 80      Kto. 60 090854  BLZ 250 202 00
Pas 60 10 · Fax Verkauf 6 24 93   Verkauf Südwag 051 55 · 624 45   Kreissparkasse Emmerthal             Postbank Hannover
e-mail: W.Neudorff@-online.de     Verkauf Südost 051 55 · 624 47   Kto. 5000 443 · BLZ 254 501 10        Kto. 30 7 7 32-308 · BLZ 250 100 30

W. Neudorff GmbH KG Emmerthal · Handelsregister Hameln HRA 452
Persönl. Gesellsch. W. Neudorff Verwaltungsgesellschaft mbH Emmerthal · Handelsregister Hameln HRB 951 · Geschäftsführer Dr E. Lohmann Dr M.-J. Lohmann

## LETTER OF REVISION OF NEUDORFF/GARDENS ALIVE AGREEMENT OF DECEMBER 6, 1996

effective on February 10, 1999,

between

the firm of W. Neudorff GmbH KG, represented by its Managing Directors, Dr. Ekkehard Lohmann and Dr. Hans Joachim Lohmann, An der Mühle 3, 31860 Emmerthal, Federal Republic of Germany,

- hereafter referred to as "Neudorff" -

and

the firm of Gardens Alive! Inc., represented by its President Niles Kinerk, 5100 Schenley Place, Lawrenceburg, Indiana 47025, USA

The following sections of the December 6, 1996 agreement are revised as follows:

21/11/2006  13:37    +49-5155-624249          NEUDORFF BETR.LEIT.              S.    04/88

## ANNEX 1HPY
### To The License Agreement

between

W. Neudorff GmbH KG

and

Gardens Alive!

Product under the agreement shall be the following products as described and with their registration numbers, where applicable, as follows:

Herbicidal Soap Concentrate H01

The Licensing period for this product shall have a duration of 5 years, beginning with the date of this annex, and then is extended another two years, unless one of the parties terminates the Agreement with at least a six month notice.

Dated: February 18, 1999

## ANNEX 3HPY
### To The License Agreement

between

W. Neudorff GmbH KG

and

Gardens Alive!

According to §9 of the Agreement, the Licensee shall sell a minimum quantity of each product listed under Annex 1 as follows:

Herbicidal Soap Concentrate (H01)                    Redacted

Note that if the sales do not reach the target specified after the first year, exclusivity for the second year can be maintained by paying the equivalent royalty payment in a timely manner.

21/11/2006  13:37   +49-5155-624249        NEUDORFF BETR.LEIT.              S.   06/08

**ANNEX 5HPY**
To The License Agreement

between

W. Neudorff GmbH KG

and

Gardens Alive!

According to §10 of the Agreement, the Licensee shall pay Neudorff a license fee for
each product under Annex 1 as follows.

    Herbicidal Soap Concentrate H01                              NIL

## ANNEX 6HPY
### To The License Agreement

between

W. Neudorff GmbH KG

and

Gardens Alive!

According to §11 of the Agreement, the Licensee shall pay Neudorff royalties for each product under Annex , based on gross sales of the Licensee to their customers. Freight, recalls and take-backs of products will not reduce the royalties and the royalties will apply to the gross selling price regardless of the unit sold, either RTU or concentrate. The royalty schedules are as follows:

### Herbicidal Soap Concentrate H01

| ANNUAL SALES CATALOGUE | ROYALTY |
|---|---|
| Redacted | Redacted |
| Redacted | Redacted |
| Redacted | Redacted |

| ANNUAL SALES RETAIL (DISTRIBUTOR) | ROYALTY |
|---|---|
| Redacted | Redacted |
| Redacted | Redacted |
| Redacted | Redacted |

2 / 18 / 1999
Date

_____
W. Neudorff GmbH KG

7/21/999
Date

_____
Gardens Alive! Inc.

# EXHIBIT C

NOV-16-2006  11:19        9   667 4386                    9376674386    P.02/11

*Herbert M. Wolfson*
*Attorney At Law*
*1213 Brook Drive*
*Wilmington, DE 19803*
*302-762-1476*

22698-95

Niles Kinerk, President
Gardens Alive!, Inc.
5100 Schenley Place
Lawrenceburg, IN 47025

Sir:

Re: Weed-Aside™ Herbicidal Soap

I have been asked to call your attention to the enclosed U. S. Patent 6,323,156, invented by Dr. R.A.Smiley which issued November 27, 2001 and was assigned to Falcon Lab LLC, Wilmington, DE.

U.S. Patent 6,323,156 claims *(inter alia)* " a method for eliminating undesirable vegetation by applying an effective amount of an aqueous solution containing ammonium pelargonate as the active ingredient wherein no more than 0.5% of the active ingredient is the free acid, i.e. pelargonic acid."

U. S. Patent 5,919,733, which appears on the "Weed-Aside" container claims *(inter alia)* "A herbicidal composition consisting essentially of an under saponified ammonium soap of pelargonic acid wherein the active ingredient has a soap to free fatty acid ratio in the range of about 3:4 to 2:1". That is, from 33% to 57% of the active ingredient in "Weed-Aside" is free pelargonic acid.

I am also enclosing an Affidavit of Dr. Smiley comparing the results obtained when treating weeds with the composition claimed in U.S. Patent 5,919,735 to the results obtained when using the treatment of weeds as claimed in U.S. Patent 6,323,156. You will note that the 50-50 blend of free pelargonic acid and ammonium pelargonate was inoperable. The pelargonic acid did not dissolve in the aqueous ammonium pelargonate solution.

"Weed-Aside" Herbicidal Soap, according to the information on the 16 oz. container and the enclosed Garden-Alive!'s Material Safety Data Sheet issued July 3, 2003 contains 22% of an ammoniated soap of fatty acids; is miscible with water in all proportions to give a clear solution; and displays a pH of 8.4 (moderately alkaline).

A    Falcon Lab's chemical analysis of "Weed-Aside" concludes that the ammoniated soaps of fatty acids present as salts is predominately ammonium pelargonate and that the pH of 8.4 eliminates the possibility of any significant amount of free acid in the active ingredient. Evaporation of "Weed-Aside" by simple exposure to air in a tray produces a solid that is identical by melting point and other chemical analyses to solid ammonium pelargonate.

It is reasonable to conclude from these data that the composition of "Weed-Aside" Herbicidal Soap does not fall within the claims of U.S. Patent 5,919,733. Instead, it seems clear that Gardens Alive! is recommending that its customers infringe at least one claim of the Smiley U.S. Patent 6,323,156. Thus, Gardens Alive! is guilty of actively inducing its customers to infringe Dr. Smiley's patent.

By placing "U.S. patent 5,919,733" on the container label, Gardens Alive! may also be guilty of misrepresenting the patent status of "Weed-Aside".

In view of the foregoing, a meeting with Falcon Lab at an early date to discuss this matter is recommended. Please contact me at the above address or phone number to arrange such a meeting.

Respectfully,

Herbert M. Wolfson
Attorney for Falcon Lab LLC

# AFFIDAVIT OF ROBERT A. SMILEY

STATE OF DELAWARE          §
                           §
COUNTY OF NEW CASTLE       §

I, Robert A. Smiley, do hereby aver and state that:

1.      I am over the age of 18;

2.      I obtained a B.S. degree in Industrial Chemistry from Case Institute of Technology in 1950 and a Ph.D. degree in Organic Chemistry from Purdue University in 1954.

3.      I have over 46 years experience as an industrial Research Chemist. From 1954 to 1990, I was employed by E.I. duPont de Nemours & Co. in Wilmington, Delaware. Subsequent to my retirement from DuPont in 1990, I have been engaged as a consulting chemist for companies in the chemical industry.

4.      I am the sole inventor of U.S. patent application serial no. 09/560,664 *6,323,156* and am familiar with the claims of the application. I have read the Office Action of May 5, 2001 in the referenced application and have read and understand the teachings of U.S. Patent No. 5,919,733 ("Sedun"). I, with my attorney, was present at the interview of June 27, 2001 with Examiner A. Pryor.

5.      I made an aqueous solution containing ammonium pelargonate alone, another containing ammonium pelargonate and free fatty acid in an amount equal to 0.5% of the contained ammonium pelargonate and an aqueous mixture containing a 50:50 weight ratio of free pelargonic acid and ammonium pelargonate as follows:

Preparation of Solution Containing 3% Ammonium Pelargonate. To a dilute ammonium hydroxide solution made by mixing 139 gm. of 28% ammonium hydroxide (2.29 moles $NH_3$) with 500 ml. of deionized water was added with stirring 361 gm. (2.29 moles) of technical pelargonic acid. The final clear solution contained 400 gm. (2.29 moles) of dissolved ammonium pelargonate in 600 gm. water or a 40 weight % ammonium pelargonate solution. To 462.5 ml. of deionized water was added 37.5 gm. of the above 40% ammonium pelargonate solution. This resulted in 500 ml. of a clear solution containing 15 gm. of dissolved ammonium pelargonate (A.P.) or 3% by weight of the total solution. This was comparison herbicide solution "3% A.P." To another identical 500 ml. of 3% ammonium pelargonate solution was added 0.075 gm. of pelargonic acid (P.A.). This gave a mixture which contained 3% dissolved ammonium pelargonate plus 0.5% of

1

the active herbicidal ingredient as free pelargonic acid. This was comparison mixture "3% A.P., .015% P.A."

Preparation of a Mixture Containing a 50:50 Weight Blend of Free Pelargonic Acid and Ammonium Pelargonate. To 462.5 ml. of deionized water was added with mixing 18.75 gm. of the 40% ammonium pelargonate solution described above and 18.75 gm. technical pelargonic acid. On standing after mixing, the pelargonic acid separated on the top of the mixture as a separate insoluble layer, i.e. the pelargonic acid did not dissolve in the aqueous ammonium pelargonate solution. This was comparison herbicide mixture (2 phases) "1.5% A.P., 1.5% P.A."

6.    I tested the herbicidal efficacy of each of the solutions and the mixture decribed in paragraph 5 above as follows: Three adjacent 1 foot by 2 foot plots of ground identically covered with several varieties of 2 inch tall grass, young ragweed and other unidentified weeds were chosen as test plots. Test solution "3% A.P." was sprayed from a hand spray on one of the plots in such a manner that the plants covering the plot were thoroughly wetted with the test solution. On the adjacent plot to the left of the first sprayed plot, test mixture "3% A.P., .015% P.A." was sprayed on the plants in the same manner using the same size and kind of hand sprayer used on the first plot. Finally, on the third plot to the right of the center plot, again using the same type of hand sprayer, an attempt was made to duplicate the previous sprayings with the "1.5% A.P., 1.5% P.A." mixture. However, a homogeneous spray which would contain the same total 3% active herbicidal ingredients as the 3% ammonium pelargonate solution was not possible since the pelargonic acid did not dissolve and was clearly visible in the sprayer as an insoluble layer. The plot was sprayed nevertheless but since the sprayer fed from the bottom of the spray bottle, only the ammonium pelargonate solution (1.5% concentration) wetted the plants. The day of spraying was clear, dry and the air temperature was between 75°F and 85°F.

7.    I observed the following: After 24 hrs. the vegetation on the middle and left plots had turned brown in exactly the same way, i.e. there was no difference in observable phytotoxicity between comparison solution "3% A.P." and comparison mixture "3% A.P., .015% P.A.". After 72 hrs., using the same judging method used in "Sedun", i.e. 0 = no phytotoxicity and 9 = complete plant kill, both plots were judged to be 8. The results show that the addition of free pelargonic acid equal to 0.5% of the total active ammonium pelargonate ingredient made no observible difference in herbicidal activity. The third plot after 24 hrs contained substantial unaffected vegetation (green) while after 72 hrs., the observed phytotoxicity was judged to be 5. This was the expected result since a total of 3% active

2

ingredient could not be achieved in comparison mixture "1.5% A.P., 1.5% P.A." because of the insolubility of pelargonic acid in water.

        8.      FURTHER AFFIANT sayeth not.

        DATED:  July 9, 2001.

                                                Robert A. Smiley, Ph.D.

**STATE OF DELAWARE**        §

                               §

**COUNTY OF NEW CASTLE**       §

        **BEFORE ME**, the undersigned authority, on this day personally appeared Robert A. Smiley, Ph.D., known to me to be the person whose name is subscribed to the foregoing instrument; and acknowledged to me under oath that he executed the foregoing document.

        **SUBSCRIBED AND SWORN TO BEFORE ME** on this the  9  day of July, 2001.

                                Kathleen H. Carson
                                Printed Name:

                                NOTARY PUBLIC IN AND FOR
                                THE STATE OF DELAWARE

                                Kathleen H. Carson

                                     KATHLEEN H. CARSON
                                     NOTARY PUBLIC
                                     STATE OF DELAWARE
                                     My Commission Expires Apr. 27, 2003

3



## MATERIAL SAFETY DATA SHEET

Page 1 of 3

### SECTION 1: PRODUCT AND COMPANY IDENTIFICATION

PRODUCT NAME: Weed-Aside ™ Weed Killer
IDENTIFICATION NUMBER: 8206, 8207
CHEMICAL NAME: salts of fatty acids
CHEMICAL FAMILY: salts of carboxylic acids
USE OF THE PREPARATION: weed control

MANUFACTURER: Gardens Alive!®, Inc.
ADDRESS: 5100 Schenley Place, Lawrenceburg, IN 47025
TELEPHONE NUMBER: (812) 537-8685, Ext. 2225

ISSUE DATE July 3, 2003
SUPERCEDES DATE: N/A

### SECTION 2: HAZARDOUS INGREDIENTS

| Component | % | Hazard Information |
|---|---|---|
| Ammonium salts of fatty acids | 22.11% | Eye irritant |

### SECTION 3: PHYSICAL AND CHEMICAL CHARACTERISTICS (FIRE AND EXPLOSION DATA)

Solubility in Water: miscible in all proportions
Appearance and Odor: clear, colorless, odor of soap, ammonia
Flash Point (°C): n/a
Specific Gravity, 25°C: 1.00
pH: 8.4±0.15
Extinguishing Media for Fires: water, $CO_2$, foams
Special Fire Fighting Procedures: normal extinguishing procedures

N/A - not applicable, NAV - not available, ca. - approximately

### SECTION 4: PHYSICAL HAZARDS

Stability: product is stable
Conditions to Avoid: exposure to excessive heat
Materials to Avoid: none known
Hazardous Decomposition Products: $CO_2$, $CO$, $NO_x$, $NH_3$
Hazardous Polymerization Conditions: none known



## MATERIAL SAFETY DATA SHEET

Page 3 of 3

### SECTION 10: OTHER INFORMATION

DISCLAIMER: The information in this Material Safety Data Sheet (MSDS) is believed to be correct as of the date issued. By making this MSDS available, Gardens Alive!® Inc. does not make any express or implied warranty (including any warranty of merchantability or fitness for a particular purpose) regarding the MSDS, its accuracy or the product to which it relates. Anyone using this information agrees that Gardens Alive! shall not be held liable (based on its negligence or otherwise) for any personal injury or other damage relating to, or arising from such use, including direct, incidental, or consequential damage and such user agrees to indemnify Gardens Alive! for any claims arising out of its use.

NOV-16-2006  11:20        7 667 4386                                    9376674386    P.08/11

US006323156B1

(12) **United States Patent**
Smiley

(10) Patent No.:     **US 6,323,156 B1**
(45) Date of Patent:        **Nov. 27, 2001**

(54) **METHOD OF USING AMMONIUM FATTY ACID SALTS AS NON-SELECTIVE HERBICIDES**

(75) Inventor:  Robert A. Smiley, Wilmington, DE (US)

(73) Assignee:  Falcon Lab LLC, Wilmington, DE (US)

(*) Notice:  Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: 09/560,664

(22) Filed:  Apr. 27, 2000

(51) Int. Cl.⁷ .............................................. A01N 37/20
(52) U.S. Cl. ........................................................ 504/320
(58) Field of Search ...................................... 504/320

(56)                    **References Cited**

U.S. PATENT DOCUMENTS

5,919,733  *  7/1999  Seiden et al. ...................... 504/320

* cited by examiner

*Primary Examiner*—Alton Pryor
(74) *Attorney, Agent, or Firm*—Locke Liddell & Sapp LLP

(57)                        **ABSTRACT**

A method for controlling undesired vegetation that comprises contacting the vegetation with a herbicidally effective amount of a composition containing the compound of the formula $R_1COO^-X^+$ wherein $R_1$ is a $C_9$ to $C_{19}$ hydrocarbyl group optionally substituted with one or more hydroxyl or $C_1$–$C_5$ hydrocarbyl groups, and X is ammonium.

20 Claims, No Drawings

NOV-16-2006  11:20          7 667 4386                    9376674386        P.09/11

US 6,323,156 B1

1

## METHOD OF USING AMMONIUM FATTY ACID SALTS AS NON-SELECTIVE HERBICIDES

### FIELD OF THE INVENTION

The present invention relates to the use of ammonium salts of fatty acids as non-selective herbicides to destroy the growth of plants.

### BACKGROUND OF THE INVENTION

There are two major categories of herbicides to treat growing weeds—selective and non-selective. Selective herbicides only kill selected weeds such as broad leafed plants like dandelion, an example being the well-known herbicide 2,4-D. The non-selective herbicides kill all weeds. Commercially known non-selective herbicides include glyphosate (such as ROUNDUP®) and paraquat. Paraquat is a known hazardous material. Roundup often has a higher than desired kill time. Non-hazardous non-selective herbicides exhibiting decreased kill time are desired.

It is therefore a principal object of this invention to provide non-hazardous non-selective herbicides having low kill time for use on unwanted vegetation.

### SUMMARY OF THE INVENTION

Vegetation may be killed by application of a composition of the formula:

$$R_1COO^-X^+ \qquad (I)$$

wherein $R_1$ is a $C_5$ to $C_{19}$ hydrocarbyl group and $X$ is ammonium ($NH_4^+$). In the formula (I), any of the hydrogen on $R_1$ may be substituted with one or more hydroxyl or $C_1$-$C_2$ hydrocarbyl group, such as an alkyl group. The herbicidal composition of the invention contains essentially no free fatty acid content. Such compounds have been found to act as "non-selective" herbicides.

The invention relates to a method for killing unwanted vegetation, by applying to the locus of the unwanted vegetation a herbicide of formula (I). The composition may be applied as an aqueous solution and may further contain a surfactant. Since the mode of action appears to be through the leaves of the vegetation, there is little, if any, residual herbicidal effect in the ground. Thus, it is possible to grow desirable plants adjacent to and around the treated area.

### DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

Unwanted vegetation may be killed by wetting the locus of the vegetation with a composition represented by the formula:

$$R_1COO^-X^+ \qquad (I)$$

wherein $R_1$ is a saturated or unsaturated $C_6$ to $C_{10}$ hydrocarbyl (preferably a $C_7$ to $C_{11}$ hydrocarbyl), or an epoxide or cyclopropane thereof, $X$ is ammonium, ($NH_4$) and any of the hydrogen on $R_1$ may be substituted with one or more hydroxyl or $C_1$-$C_2$ hydrocarbyl groups. This herbicidal composition contains less than 0.5 wt. % free fatty acids. More preferably, the herbicidal composition of the invention contains less than 0.3 wt. % free fatty acids. In a preferred embodiment, the herbicidal composition of the invention contains essentially no free fatty acids. The herbicidal compositions of the invention may further contain a surfactant.

Any solvent in which the herbicide is soluble may be employed as a diluent. As a post-emergent, the herbicides of

2

the invention are preferably applied to the locus of the unwanted vegetation as an aqueous solution.

The method of the invention may be used to control established vegetation in the vicinity of a seeded crop or in a weed concentrate area by contacting the foliage of the unwanted vegetation with the herbicidal composition. The herbicidal activity of such herbicidal compositions rapidly dissipates in the unwanted vegetation upon contact.

The herbicide is applied as a solution to the locus of the unwanted vegetation in effective amounts. Typically, the herbicide is applied as an aqueous solution. Typically, the amount of herbicide in the formulation is between about 1 wt. % to about 30 weight percent, preferably between about 1.5 weight percent, more preferably for spray applications from about 3 to about 10 weight percent and for some other applications about 10 to about 15 weight percent.

The herbicides of the invention exhibit several advantages not previously seen with other commercial herbicides. These advantages include:

More Rapid Kill Time.

Vegetation usually starts to die within an hour after receiving a single application. Typically unwanted vegetation is dead in less than 24 hours. Some readily obtainable herbicides require at least seven days. Further, herbicides evidencing quicker kill times in the prior art are highly toxic.

Based on Naturally Occurring Compounds.

Suitable herbicides for use in the invention include several based on acids found in nature. No commercially known water soluble herbicides are based on naturally occurring compounds.

Action is Through the Leaves.

In light of the quick kill time of the herbicidal compositions of the invention, reseeding can take place immediately. Most commercial herbicides must be allowed to degrade before reseeding.

Non-toxic and Biodegradable.

Herbicides within the invention are non-toxic and further are biodegradable. Most commercial herbicides are hazardous to apply.

Low Cost.

The herbicides of the invention are relatively low in cost.

Easy Transportation.

Unlike most commercial herbicides which are liquids must be shipped in containers requiring special disposal methods, the herbicides of the invention are water soluble solids and thus may be shipped in readily disposable containers. Upon reaching their desired location, the solid herbicide may be prepared into solutions at their requisite strength. Alternatively, the herbicides of the invention may be shipped as liquid compositions.

The herbicidal composition of the invention is contacted with the foliage of the unwanted vegetation by spraying or otherwise distributing the composition onto the foliage. Leaves of vegetation sprayed with herbicidal compositions of the invention usually start to shrivel or turn brown within hours after application. Necrosis is evident, usually in 24 hours. In the case of smaller weeds such as dandelions, chickweed and other common lawn weeds, the roots of the plants also shrivel and turn brown or black within 24 hours.

Spraying is a preferred method of wetting the leaves. A light spray is usually sufficient to kill the plant at ambient temperatures above 20° C. without any additional treatment. Herbicidal effectiveness generally increases with temperature.

Weeds and grasses which have been killed by use of the herbicidal composition of the invention include quack grass, buttercup, common cinquefoil, multi flora rose, common

## US 6,323,156 B1

**3**

yellow woodsorrel, prostrate spurge, poison ivy, poison hemlock, common speedwell, broadleaf plantain, Japanese honeysuckle, dandelion, wild violet, Bermuda grass, nutsedge, wild garlic, knotweed, red sorrel, lambs quarters, pokeweed, carpetweed, crabgrass, buckhorn plantain, nimblewill or common chickweed.

The following examples will illustrate the practice of the present invention in its preferred embodiments. Other embodiments within the scope of the claims herein will be apparent to one skilled in the art from consideration of the specification and practice of the invention as disclosed herein. It is intended that the specification, together with the examples, he considered exemplary only, with the scope and spirit of the invention being indicated by the claims which follow.

### EXAMPLE 1

A 12 liter round bottom kettle equipped with stirrer and capable of being cooled was charged with 1218.8 gm. (7.7 mole) of pelargonic acid and 3440 mL of deionized water. To this was fed with stirring 910.7 gm. 30% ammonium hydroxide. The temperature was maintained below 30° C. by cooling and adjusting the feed rate. The mixture became very thick and difficult to stir when approximately 15% of the total ammonium hydroxide had been added. To get better stirring, 2016 mL more deionized water was added for a total of 5456 mL. When approximately 65% of the ammonium hydroxide was added, the solution turned crystal clear and remained so until all the ingredients were mixed. The final water white solution contained 17% ammonium pelargonate. Isolated anhydrous ammonium pelargonate from this solution is a soft, white, crystalline solid melting at 62° C. Ammonium pelargonate is extremely water soluble but is insoluble in acetone.

### EXAMPLE 2

Jimson weed, soybean, common ragweed and annual grass (combination of annual bluegrass and fall panicum) were grown in 12 inch by 12 inch flats in a greenhouse maintained at 80° F. with supplemental lighting used to extend daylength to 16 hrs. Flats were watered as needed. When the plants were 3–6 inches high they were sprayed with a solution of 5% ammonium pelargonate solution prepared by dilution of a 17% solution with the required amount of water. The spraying was done in a spray chamber with a track mounted sprayer adjusted to spray at a rate of 50 gallon/acre. The control (degree of injury) obtained was Jimson weed (85%), soybean (75%) common ragweed (30%) while annual grass control was less than 10%.

### EXAMPLE 3

Using the same procedure as set forth in Example 2, the flats were seeded with velvetleaf, annual morning glory, common ragweed and crabgrass. After growth some flats were treated with 5% ammonium pelargonate solution while others were sprayed with 10% ammonium pelargonate in the spray chamber at the same 50 gallon/acre rate. There was only a slight difference in the control rate between the two concentrations. At the 10% concentration, velvetleaf control was 90%, morning glory was 90%, common ragweed was 85% and crabgrass was 70%.

### EXAMPLE 4

The same mixture used in Example 1 was sprayed on all of the leaves of larger plants including poison hemlock,

**4**

Japanese honeysuckle, poison ivy, multiflora rose, tall buttercup, pokeweed, ragweed, wild grape and lambsquarters. All treated plants died within 24–48 hours. There was no re-growth.

### EXAMPLE 5

The leaves of tree suckers sprouting from the stumps of a variety of sawed off trees were sprayed with the mixture used in Example 1. The sprouts all died within 24–48 hours and no new growth from the stumps occurred.

### EXAMPLE 6

Dilute ammonium hydroxide was added to 125 g. of pelargonic acid until the pH of the resulting solution was 7 as indicated by pH paper. Enough water was added to bring the total solution to 2 liters. This 6.9% neutral solution of ammonium pelargonate was sprayed from a hand sprayer on dandelion, moneywort, Japanese honeysuckle, star of Bethlehem and henbit. Damage to the plants was evident within 4 hours as evidenced by wilting and/or change of color. The treated dandelion was dead within 12 hours. The rest were dead within 24–36 hours. This solution foamed on contact with the plant leaves.

### EXAMPLE 7

The following weeds growing in the wild were treated with a 10% water solution of ammonium pelargonate; common evening primrose, Japanese honeysuckle, multiflora rose, common chickweed, henbit, wild onion, hairy bitter cress, dandelion and plantain. Treatment consisted of wetting the leaves of the plants with a hand sprayer. Damage was apparent on all plants within 12 hrs as evidenced by wilting and discoloration. The treated plants were all dead within 36–48 hours.

### EXAMPLE 8–9

Large crabgrass, giant foxtail, jimsonweed, velvetleaf and annual morning-glory were seeded into 12 inch by 12 inch flats filled with potting soil maintained in a greenhouse at 80° F. Supplemental lighting was used to extend daylength to 16 hours. The flats were watered as needed. Three weeks after planting, when the grasses were about 3 inches tall and the broadleaves were 2 to 4 inches tall, individual flats were treated with 5, 7.5, 10 and 15% solutions of ammonium pelargonate. For comparison purposes, other flats were treated with the same concentrations of pelargonic acid prepared from a commercially available herbicide sold under the tradename "Scythe" by Dow AgraSciences. The solutions were applied with a track-mounted sprayer in a spray booth at the rate of 50 gal./acre.

Ammonium pelargonate application resulted in plant injury within hours of application. Symptoms were typically water-soaked lesions that quickly resulted in dead tissue. Maximum injury symptoms were observed in the first week after treatment. With morning-glory, all concentrations gave the same control of 70%. However, with jimson weed there was a rate response with increasing rates giving increased control. Velvetleaf control was better at the 10 and 15% rates than at the 5 and 7.5% rates.

In relation to pelargonic acid, ammonium pelargonate was better than the commercial "Scythe" formulation. Lower concentrations of ammonium pelargonate gave better jimsonweed control than "Scythe" at higher concentration. At equal concentrations, ammonium pelargonate gave better control of velvetleaf and morning-glory than "Scythe", particularly at one week after treatment.

US 6,323,156 B1

5

**COMPARATIVE**

**EXAMPLE 10**

The same variety of weeds set forth in Example 7 were treated with a 10% solution of potassium pelargonate made by neutralizing 80 gm. Pelargonic acid in 200 mL water with 50% aqueous potassium hydroxide to a pH of 7 as indicated by pH paper followed by dilution with water to 1 liter of solution. None of the weeds were affected by the potassium pelargonate solution even after a week. Thus, ammonium pelargonate has herbicidal properties while the potassium salts has none.

What is claimed is:

1. A method for the prevention or elimination of undesired vegetation which comprises applying to the vegetation a herbicidally effective amount of an aqueous solution which contains, as the active ingredient, a salt represented by the formula:

$$R_1COO^- X^+ \qquad (I)$$

wherein $R_1$ is a $C_6$ to $C_{19}$ hydrocarbyl group, optionally substituted with a hydroxyl or a $C_1$–$C_5$ hydrocarbyl group; and

X is ammonium;

wherein no more than 0.5 wt. % of the active ingredient is free fatty acid.

2. The method of claim 1, wherein the composition contains two or more compounds of formula $R_1COO^- X^+$.

3. The method of claim 1, wherein $R_1$ is a $C_7$ to $C_{11}$ hydrocarbyl group.

4. The method of claim 3, wherein the compound of formula (I) is ammonium pelargonate.

5. The method of claim 1, wherein the composition contains two or more salts represented by formula (I) wherein $R_1$ is selected from $C_8$, $C_9$, and $C_{10}$ hydrocarbyl groups.

6. The method of claim 5, wherein one of the salts is ammonium pelargonate.

7. The method of claim 1, wherein the composition further comprises a diluent.

8. The method of claim 7, wherein the diluent is water and the compound of formula (I) is ammonium pelargonate.

9. The method of claim 1, wherein the vegetation is quack grass, buttercup, common cinquefoil, multi flora rose, common yellow woodsorrel, prostrate spurge, poison ivy, poison hemlock, common speedwell, broadleaf plantain, Japanese honeysuckle, dandelion, wild violet, Bermuda grass,

6

nutsedge, wild garlic, knotweed, red sorrel, lambs quarters, pokeweed, carpetweed, crabgrass, buckhorn plantain, mireblewill or common chickweed.

10. A method for the prevention or elimination of undesired vegetation which comprises applying to the vegetation a herbicidally effective amount of an aqueous solution which contains, as the active ingredient, a salt represented by the formula:

$$R_1COO^- X^+ \qquad (I)$$

wherein $R_1$ is a $C_6$ to $C_{19}$ hydrocarbyl group, optionally substituted with a hydroxyl or a $C_1$–$C_5$ hydrocarbyl group; and

X is ammonium;

wherein no more than 0.1 wt. % of the active ingredient is free fatty acid.

11. The method of claim 10, wherein the composition contains two or more salts of the formula $R_1COO^- X^+$.

12. The method of claim 10, wherein $R_1$ is a $C_7$ to $C_{11}$ hydrocarbyl group.

13. The method of claim 12, wherein the salt of formula (I) is ammonium pelargonate.

14. The method of claim 10, wherein the composition contains two or more salts represented by formula (I) wherein $R_1$ is selected from $C_8$, $C_9$, and $C_{10}$ hydrocarbyl groups.

15. The method of claim 14, wherein one of the salts is ammonium pelargonate.

16. The method of claim 10, wherein the composition further comprises a diluent.

17. The method of claim 16, wherein the diluent is water and the compound of formula (I) is ammonium pelargonate.

18. The method of claim 10, wherein the vegetation is quack grass, buttercup, common cinquefoil, multi flora rose, common yellow woodsorrel, prostrate spurge, poison ivy, poison hemlock, common speedwell, broadleaf plantain, Japanese honeysuckle, dandelion, wild violet, Bermuda grass, nutsedge, wild garlic, knotweed, red sorrel, lambs quarters, pokeweed, carpetweed, crabgrass, buckhorn plantain, mireblewill or common chickweed.

19. The method of claim 1, wherein the composition contains from about 5 to about 10 percent by weight of the compound of formula (I).

20. The method of claim 1, wherein the composition contains from about 10 to about 15 percent by weight of the compound of formula (I).

* * * * *

# EXHIBIT D

*Herbert M. Wolfson*
*Attorney At Law*
*1213 Brook Drive*
*Wilmington, DE 19803*
*302-762-1476*

February 15, 2008

William C. Geary, III, Esq.
NUTTER McCLENNEN & FISH LLP
World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210-2604



Mr. Geary:

### Re: Falcon Lab U. S. Patent 6,323,156
### Files 4/29/2000; issued 11/27/2001

    You are constantly changing the reasons why Neudorff, Neudorff's licensees and Neudorff's licensee's customers do not infringe the subject patent. None of your letters have been convincing including the latest one. In that correspondence dated February 1, 2008, you have clarified two alleged bases for invalidating the subject patent:

1.    **The CONCERN® product sold in the U. S. in 1998 more than one (1) year prior to the filing date of the '156 patent is the same as Neudorff's H01 Herbicidal Soap that received EPA Registration Number 67702-7 after Mr. Walter Telarek had filed Neudorff's application in 1997 for H01 Herbicidal Soap, a broad-spectrum herbicide, wherein the active ingredient is ammonium (not ammonia) nonanoate in an acid-free aqueous solution.**

    By copy of this letter to Mr. Telarek, Falcon Lab requests from him confirmation that the H01 RTU Herbicidal Soap was NOT sold by Neudorff or any of its licensees in the U. S. prior to April 29, 1999 for the following reason:

    On March 16, 1998, H01 RTU Herbicidal Soap <u>containing only ammonium nonanoate as the active ingredient according to EPA records in our possession</u> (**no free acid**) was <u>conditionally</u> accepted as EPA Reg. No. 67702-7. Among the conditions was:

    "Submit one copy of the printed label for the record BEFORE YOU RELEASE THE PRODUCT FOR SHIPMENT." (The printed label means the label that will be affixed to the product container.)

This was followed by:

"If these conditions are not complied with, the registration (Reg. No. 67702-7) will be subject to cancellation."

After a proposal to amend this registration for Neudorff by Mr. Telarik, the EPA, in August 1999, suggested a further change and again stated: "Submit one copy of your final label incorporating the change BEFORE YOU RELEASE THE PRODUCT FOR SHIPMENT."

Registration of H01 Herbicidal Soap with an active ingredient of 3.68% "ammoniated soap of fatty acids" (amended from 3.68% ammonium nonanoate) was accepted unconditionally by the EPA in the spring of 2000.

At that time, Neudorff had complied with the conditions set forth by the EPA and did not release the H01 RTU product in 1998 but sometime after 4/29/1999, less than one year prior to the filing date of Falcon's '156 patent.

As examples, registration for sale of CONCERN® Fast Acting Weed Killer RTU in New York State was accepted on August 25, 1999 and H01 Herbicidal Soap as both an RTU and a concentrate was proposed for registration in California on October 18, 1999 (less than one (1) year prior to the filing date of the '156 patent). To offer these products for sale in either of these states or any other state would have been illegal until an accepted approval by the U. S. EPA was obtained. The active ingredient listed for the H01 herbicides in California when they were proposed for registration was "FREE FATTY ACIDS AND/OR AMINE SALTS." Both the Florida EPA and the California EPA informed Falcon Lab in 2007 that ammonium nonanoate had never been registered for use as an herbicide in their states.

You again allege that:

2.    **CONCERN® Fast-Acting Weed Killer was first offered for sale in the United States at least by 1998 by Necessary Organics, a licensee of Neudorff; and the active ingredient of this product is covered by EPA Reg. No. 67702-7 (the same as H01 Herbicidal Soap).**

By copy of this letter to James B. Rader, Esq., attorney for The Scotts Miracle-Gro Company, Falcon Lab requests information that the product sold by Necessary Organics (a company that was acquired by Scotts in 1992) was NOT an acid-free aqueous solution of ammonium nonanoate as set forth in EPA Reg. No. 67702-7 for H01 Herbicidal Soap. That is, the Concern® Fast-Acting Weed Killer described in the attached Material Safety Data Sheet (MSDS) signed by Carrie Crawford, and issued by Necessary Organics, Inc. on July 13, 1998 was NOT an acid-free aqueous solution of ammonium nonanoate; but, as you, Mr. Geary, who represents Neudorff in the U. S., stated in your December 20, 2007 letter to me, these products (Neudorff herbicides) "are slightly under-saponified as manufactured and sold and contain more than 0.5 wt. % of the

2

**active ingredient as free fatty acid.**" This is not the description of the Neudorff herbicidal products registered by the EPA.

In the enclosed 1998 MSDS, Concern® Fast-Acting Weed Killer is stated to be "a formulation of ammonium salts of fatty acids and isopropyl alcohol." Since the formulation described in the MSDS contains isopropyl alcohol, Falcon Lab requests Cameron Wilson to confirm that Concern® Fast-Acting Weed Killer sold by Necessary Organics was NOT an acid-free aqueous solution of ammonium nonanoate but that it contained more than than 0.5 wt. % of nonanoic acid as you stated in your Dec. letter. In Table I in Mr. Wilson's (and F. Sedun's) U. S. Patent 5,919,733 on herbicidal compositions assigned to Neudorff, <u>under-saponified acid</u> in the example given requires isopropyl alcohol to dissolve the otherwise insoluble nonanoic (pelargonic) acid to produce a water-miscible product, the same concentration of <u>acid-free</u> ammonium nonanoate <u>now</u> registered and licensed by Neudorff as Concern® Fast-Acting Weed Killer and other similar products labeled as containing "ammonium soaps of fatty acids". Table I of Neudorff's U. S. Patent 6,258,752 (same inventors) also describes the use of isopropyl alcohol in this manner to produce an RTU product containing <u>3.68 wt. %</u> active ingredient consisting of <u>under-saponified</u> (47% saponified) ammonium nonanoate (pelargonate) and 53% free acid.

You may advise Mr. Wilson to disregard this request, but a non-response is also an answer to our allegation. You might also suggest to him that he should reconsider telling his customers that they can ignore the subject patent.

3.    Since it is clear that the Necessary Organic's product in 1998 has not been <u>**proven**</u> to be an acid-free solution of ammonium nonanoate (and was based on the examples in the application for U. S. Patent 5,919,733) and that Neudorff's H01 herbicidal Soap (containing only ammonium nonanoate) as registered by the EPA as Reg. No. 67702-7 was not released for shipment until sometime after April 29, 1999 (less than one year before the filing date of Falcon's 156 patent), the Falcon '156 patent is valid until April 29, 2020 and is infringed by all of Neudorff's licensees and their customers.

By copies of this letter to Neudorff management, and the infringers whose lawyers or representatives have communicated with me, Falcon is offering licenses under its '156 patent at reasonable terms for past infringement and future operations.

Please contact the undersigned at your earliest convenience to settle this matter amicably.

Yours truly,

*Herbert M. Wolfson*

Herbert M. Wolfson

3

CC: Cameron D. Wilson, Neudorff North America

Andreas Prokop, Ph.D., Neudorff GmbH

Walter Talarek, Neudorff

Joan Smiley, President, Falcon Lab LLC

Gary Mossman, CEO, Dixie Chemical Co.

James H. Raden, Esq., Welsh & Katz, Ltd.

Amy J. Yoder, Schultz Company

Michael C. Li, Esq., Wal-Mart

Craig Harmer, gardens alive!

# MATERIAL SAFETY DATA SHEET

## Concern® Fast-Acting Weed Killer

### 1. COMPONENTS:

Concern® Fast-Acting Weed Killer is a ready to use formulation of ammonium salts of fatty acids and isopropyl alcohol.

### 2. PHYSICAL PROPERTIES:

Concern® Fast-Acting Weed Killer is a clear, odorless liquid with an odor of soap, ammonia. The product is stable with no known hazardous polymerization conditions. It is easily mixed with water.

### 3. HAZARD DATA: 29CFR 1910.1200

NFPA HAZARD SIGNAL:

| Health | Flammability |
|--------|--------------|
| 1 | 0 |
| 0 | 0 |
| Stability | Specific Hazard |

HAZARDS CODE

0  Insignificant
1  Slight
2  Moderate
3  High
4  Extreme

DOT HAZARD CLASS: None
A HAZARD WASTE CLASS: III CAUTION.

### 4. SAFE USAGE DATA:

PROTECTIVE EQUIPMENT
    Eyes: None required.
    Respiratory: None required.
    Gloves: None required
VENTILATION
    General Mechanical: Specific ventilation is not normally necessary.
    Local Exhaust: Not normally necessary.
PRECAUTIONS
    Handling & Storage: Store at ambient temperatures, tightly capped. Avoid exposure to excessive heat.

### 5. EMERGENCY RESPONSE:

FIRE:
    Extinguishing Media: Water, carbon dioxide, foams
    Special Procedures: Normal extinguishing procedures.
    Hazardous Decomposition Products: Carbon dioxide, carbon monoxide, nitrates, ammonia.
EXPOSURE:
    First-Aid Measures:
        Inhalation: Remove to fresh air. If irritation persists, consult a physician.
        Skin: Wash with soap and water.
        Eyes: Flush eyes for at least 15 minutes, consult a physician.
        Ingestion: Drink plenty of water.
SPILLS: Absorb large spills with absorbent materials. Will be very slippery.
WASTE DISPOSAL METHOD: Dispose of in accordance with local regulations.

### 6. HEALTH HAZARD INFORMATION:

EFFECTS OF OVER-EXPOSURE:
    Skin: May cause irritation; prolonged or frequent contact may cause allergic reaction.
    Eyes: Can be expected to cause moderate irritation.
    Ingestion: May cause irritation.
    Inhalation: Can be expected to cause irritation if fine droplets are inhaled.
    Medical Conditions Aggravated: Chronic skin, eye respiratory disease.
EMERGENCY TREATMENT: Remove from exposure. Contact physician.

### MANUFACTURER:

Necessary Organics, Inc.
One Nature's Way
New Castle, Virginia 24127-0305

EMERGENCY PHONE #: 540/864-5103
DATE: 7/13/98
SIGNATURE: _Carrie Gaufherd_

The information presented above is believed to be correct and is the most accurate information available to us at this time. However, Necessary Organics, Inc. makes no warranty, express or implied and assumes no liability for this information and the product described herein.

CAS = Chemical Abstracts Service
CFR = Code of Federal Regulations
NFPA = National Fire Protection Association

DOT = U.S. Department of Transportation
EPA = U.S. Environmental Protection Agency
TLV = Threshold Limit Value

All ©, TM property of Necessary Organics, Inc.
© All rights reserved, 1995
MSDS PMS

# EXHIBIT E

*Herbert M. Wolfson*
*1213 Brook Drive*
*Wilmington, DE 19803*
*302-762-1476*



January 29, 2007

William C. Geary, III, Esq.
NUTTER McCLENNAN & FISH LLP
World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210-2604

Re: Infringement of Falcon's U.S 6,323,156

Dear Mr. Geary:

Your recent response on behalf of W. Neudorff as the licensor of the Garden Alive! Weed-Aside™ product is not completely understood.

**1.** You state that:

"The Weed-Aside product has <u>more than 0.5% of the active ingredient as free fatty acid</u> in its concentrated formulation and in an applied formulation that is diluted as recommended,"

**a.** According to the enclosed Garden Alive! Material Safety Data Sheet (MSDS), your statement is not true!

Refer to Section 2: the only active component of Weed-Aside Weed Killer is "ammonium salts of fatty acids 22.11%." **NO FREE FATTY ACID** is stated.

In Section 3, the solubility in water is stated to be " miscible in all proportions" and the pH is $8.4 \pm 0.01$.

**b.** According to the enclosed page 1267 of the *Merck Index (13th Ed.)* and the data from the internet site CHEMICALLAND.com, pelargonic acid, the corresponding fatty acid according to Neudorff's website, is <u>insoluble in water.</u>

**c.** The melting points of the isolated solids obtained by evaporation of Weed Aside at room temperature and solid ammonium pelargonate crystals are identical at

57.7° C. A mixed melting point of a 50/50 mixture of the two solids was determined to be
57.0° C. showing that the two compounds are the same and roughly the same purity.

These results confirm the statement on the container and in the MSDS. The only
active ingredient in Weed-Aside Weed Killer is "the ammoniated soap of fatty acids –
22%". The inert ingredients equal 78%.

**2.**     In the last paragraph of your 12/20/06 letter, you state that:

"A sample of ammonium pelargonate containing 88% soap and 12% free fatty
acid would have a pH of approximately 8."

The chemists employed by my client would like to know the procedure used to
dissolve the sample in water; the concentrations of the two ingredients in the water; and
whether there was a single-phase solution for which the pH was approximately 8.

**3.**     Finally, you state that:

"Necessary Organics, Inc. of New Castle, VA, another licensor of Neudorff, first
offered for sale and sold in the United States as early as October 1998 a product
containing active ingredients identical to those of the Weed-Aside product."

As I understand your statement, Necessary Organics in 1998, offered for sale and
sold for herbicidal use a product containing the product described in the attached MSDS
for Weed-Aside Weed Killer. This product, to anticipate Falcon Lab's patent claim,
contained less than 0.5% free fatty acid (Weed-Aside contains solely ammonium salts of
fatty acids) and was sold under license from Neudorff.

Before recommending that Falcon lab dedicate U.S. Patent 6,323,156, please send
me at least the following supporting documentation:

**a.** The offer for sale and the sale document from Necessary Organics to a specific
customer dated in 1998;

**b.** The MSDS issued by Necessary Organics prior to the sale in 1998;

**c.** A list of the other Neudorff licensees who issued MSDS's as required by law;

**d.** Any other documents that you believe will support your allegation of invalidity
pursuant to 35 USC§102 (b).

By copy of this letter to Gardens Alive!, we request that they cease sales of Weed Aside™ Weed-Killer in the United States until they obtain a license to do so from Falcon Lab.

By copy of this letter to Woodstream Corp., we request that they cease sales of Concern™ Fast-Acting Weed Killer in the United States until they obtain a license to do so from Falcon Lab.

By copy of this letter, we request that W. Neudorff Gmbh provide copies of their certified EPA registrations 67702-7 and 67702-8 as herbicides, along with a list of the States these herbicides are currently registered in, showing that the only active ingredient (3.68% or 22%) is either:

"Ammoniated soap of fatty acids: or ammoniated salts of fatty acids."

Nowhere in any of the Neudorff North America licensor's literature is free fatty acid listed as an active ingredient even though it has been known for decades that pelargonic acid is herbicidal and, if present, must be listed on the label since it is not an inert ingredient. It should also be noted that the CAS# 84776-33-0 listed on various registrations for Neudorff herbicides does not include free acid in its definition.

Falcon Lab would like to settle this matter amicably with Neudorff, and suggest a meeting in Wilmington at their earliest convenience.

Sincerely yours,

Herbert M. Wolfson
Attorney for Falcon Lab LLC

cc: Gardens Alive!, 5100 Schenley Place, Lawrenceburg, IN 47025
    Woodstream Corp., 109 N. Locust Street, Lititz, PA 17543
    W. Neudorff, P.O.Box 178, Brentwood Bay, BC, V8M 1R3, Canada

10/10/2006 04:13 PM

...ge Center



# MATERIAL SAFETY DATA SHEET

Page 1 of 3

## SECTION 1: PRODUCT AND COMPANY IDENTIFICATION

| | |
|---|---|
| PRODUCT NAME: | Weed-Aside ™ Weed Killer |
| IDENTIFICATION NUMBER: | 8206, 8207 |
| CHEMICAL NAME | salts of fatty acids |
| CHEMICAL FAMILY | salts of carboxylic acids |
| USE OF THE PREPARATION: | weed control |

| | |
|---|---|
| MANUFACTURER: | Gardens Alive*, Inc. |
| ADDRESS: | 5100 Schenley Place, Lawrenceburg, IN  47025 |
| TELEPHONE NUMBER: | (812) 537-8665, Ext. 2285 |

| | |
|---|---|
| ISSUE DATE | July 3, 2003 |
| SUPERCEDES DATE: | N/A |

## SECTION 2: HAZARDOUS INGREDIENTS

| Components | % | Hazard Information |
|---|---|---|
| Ammonium salts of fatty acids | 22.11% | Eye irritant |

## SECTION 3: PHYSICAL AND CHEMICAL CHARACTERISTICS (FIRE AND EXPLOSION DATA)

| | |
|---|---|
| Solubility in Water: | miscible in all proportions |
| Appearance and Odor: | clear, colorless, odour of soap, ammonia |
| Flash Point (°C): | n/a |
| Specific Gravity, 25°C: | 1.00 |
| pH: | $8.4 \pm 0.10$ |
| Extinguishing Media for Fires: | water, $CO_2$, foams |
| Special Fire Fighting Procedures: | normal extinguishing procedures |

N/A - not applicable, NAV - not available, ca. - approximately

## SECTION 4: PHYSICAL HAZARDS

| | |
|---|---|
| Stability: | product is stable |
| Conditions to Avoid: | exposure to excessive heat |
| Materials to Avoid: | none known |
| Hazardous Decomposition Products: | $CO_2$, CO, $NO_x$, $NH_3$ |
| Hazardous Polymerization Conditions: | none known |



# MATERIAL SAFETY DATA SHEET

Page 3 of 3

## SECTION 16: OTHER INFORMATION

DISCLAIMER: The information in this Material Safety Data Sheet (MSDS) is believed to be correct as of the date issued.  By making the MSDS available, Gardens Alive*, Inc. does not make any express or implied warranty (including any warranty of merchantability or fitness for a particular purpose) regarding the MSDS, its accuracy or the product to which it relates. Anyone using this information agrees that Gardens Alive shall not be held liable (based on its negligence or otherwise) for any personal injury or other damage relating to, or arising from such use, including direct, incidental, or consequential damage and such user agrees to indemnify Gardens Alive for any claims arising out of its use.

Crystals from DMF, mp 270-272° (dec). Slightly sol in water; sol in alkaline and acidic solutions. LD$_{50}$ in mice (mg/kg): 225 i.v., 1000 orally; in rats (g/kg): 1.5 i.p., 2.5 orally (Goneffon). **Methanesulfonate dihydrate.** [149676-40-4]; [70458-95-6] (methanesulfonate). Pefloxacin mesylate; 1589mRB; Peflacine; Peflox. C$_{17}$H$_{20}$FN$_3$O$_3$.CH$_4$SO$_3$.2H$_2$O; mol wt 465.50.
THERAP CAT: Antibacterial.

**7139. Pefurazoate.** [101903-30-4] 2-(2-Furanylmethyl)-(1H-imidazol-1-ylcarbonyl)amino]butanoic acid 4-pentenyl ester; peat-4-enyl-N-furfuryl-N-imidazol-1-ylcarbonyl-DL-homoalaninate; UR-0003; UHF-8615; Healthied. C$_{18}$H$_{23}$N$_3$O$_4$; mol wt345.39. C 62.59%, H 6.71%, N 12.17%, O 18.53%. Ergosterol biosynthesis inhibitor which acts as a rice seed disinfectant. Prepn: Y. Hirota et al., JP 60240572; eidem, CA 1324698 (1985, 1993 both to Ube); and fungicidal activity: M. Takenaka et al., J. Pestic. Sci. 18, 15 (1993). Soil degradation and adsorption: idem et al., 16, 631 (1991). Metabolism in rice seedlings: S. Sakai et al., ibid. 18, 217 (1993). Review of properties and use as disinfectant: M. Takenaka, I. Yamane, Japan Pestic. Inf. 57, 33-36 (1990); T. Wada et al., J. Pestic. Sci. 24, 238-240 (1999).



Pale brownish liquid, dec at 235°. n$_D^{24.4}$ 1.5140. d$_4^{25}$ 1.152. Vapor pressure (23°): 6.48 × 10$^{-6}$ Pa. Soly at 25° (g/l): water <343; n-Hexane 12.0; cyclohexane 36.9; DMSO >1000; ethanol >1000; acetone >1000; acetonitrile >1000; chloroform >1000; ethyl acetate >1000; toluene >1000. Log P (octanol/water): 3.00. LD$_{50}$ in male, female rats, male, female mice (mg/kg): 981, 1051, 1299, 946 orally; in rats (mg/kg): >2000 dermally. LC$_{50}$ in rats (mg/m³): >3450 by inhalation. LC$_{50}$ (48 hr) in carp, Rainbow trout, Bluegill sunfish (ppm): 16.9. 4.0, 120 (Takenaka, 1990).
USE: Fungicide.

**7140. Pegvisomant.** B2036-PEG; [18-aspartic acid, 21-asparagine, 120-lysine, 167-asparagine, 168-alanine, 171-serine, 172-arginine, 174-serine, 179-threoninejsomatotropin (human) conjugate with polyethylene glycol; Somavert; Trovert. Growth hormone receptor antagonist. Genetically engineered analog of human growth hormone conjugated to polyethylene glycol (PEG) to improve bioavailability. Prepn: B. C. Cunningham et al., WO 97 11178; eidem, US 5849535 (1997, 1998 both to Genentech). Bioactivity and receptor binding: V. Goffin et al., Endocrinology 140, 3853 (1999). Clinical pharmacology: J. O. Thorner et al., J. Clin. Endocrinol. Metab. 84, 2098 (1999). Clinical trial in acromegaly: P. J. Trainer et al., N. Engl. J. Med. 342, 1171 (2000).
THERAP CAT: In treatment of acromegaly.

**7141. Pelargonic Acid.** [112-05-0] Nonanoic acid; nonylic acid; nonoic acid. C$_9$H$_{18}$O$_2$; mol wt 158.24. C 68.31%, H 11.46%, O 20.22%. CH$_3$(CH$_2$)$_7$COOH. Occurs as an ester in oil of pelargonium: Redtenbacher, Ann. 59, 41, 52, 54 (1846). Prepn from unsaturated hydrocarbons by the oxo process: Hill, US 2815355 (1957 to Standard Oil of Indiana); from tall oil unsaturated fatty acids: Maggiolo, US 2865937 (1958 to Welsbach); by oxidation of oleic acid: Mackenzie, Morgan, US 3720046 (1958 to Celanese); from rice bran oil fatty acid: Mishra et al., US 3060211 (1962 to Toya Koatsu Ind.). Purification: Fort, Riser, US 2890230 (1959 to U.S.D.A.). Toxicity study: L. Orò, A. Wretlind, Acta Pharmacol. Toxicol. 18, 141 (1961).
Colorless, oily liquid at ordinary temp; crystallizes when cooled; characteristic odor. d$_4^{20}$ 0.907. mp 12.5°. bp$_{766}$ 252-

253°; bp$_{14}$ 143-145°; bp$_1$ 132-133°. n$_D^{20}$ 1.4330; n$_D^{40}$ 1.4245. Practically insol in water. Sol in alcohol, chloroform, ether. LD$_{50}$ i.v. in mice: 224±4.6 mg/kg (Orò, Wretlind).
Caution: Strong irritant.
USE: In the production of hydrotropic salts (hydrotropic salts form aq solns which dissolve sparingly sol substances to a greater extent than water); in the manuf of laquers, plastics.

**7142. Pelargonidin.** [134-04-3] 3,5,7-Trihydroxy-2-(4-hydroxyphenyl)-1-benzopyrylium chloride; 3,4',5,7-tetrahydroxyflavylium chloride; 3,4',5,7-tetrahydroxy-2-phenylbenzopyrylium chloride. C$_{15}$H$_{11}$ClO$_5$; mol wt 306.70. C 58.74%, H 3.62%, Cl 11.56%, O 26.08%. The aglucone of pelargonin: Willstätter, Bolton, Ann. 408, 42 (1914). Synthesis: Malkin, Robinson, J. Chem. Soc. 127, 1190 (1925); Robertson et al., 1928, 1533. Prepn from kaempferol: Mirza, Robinson, Nature 166, 997 (1950); King, White, J. Chem. Soc. 1957, 3901.



Reddish-brown prisms from 2% HCl or from alcoholic HCl. Not melted at 350°. Absorption max (ethanol + 0.01% HCl): 530 nm (ε 32,000). Sol in alcohol, methanol; moderately sol in water; slightly sol in chloroform.
**3,5-Diglucoside.** [17334-58-6] 3,5-Bis(β-D-glucopyranosyloxy)-7-hydroxy-2-(4-hydroxyphenyl)-1-benzopyrylium chloride; pelargonin; monardin; salvinin; punicin. C$_{27}$H$_{31}$ClO$_{15}$; mol wt 630.98. From flowers of Pelargonium zonale Ait. var. motror, Geraniaceae: Willstätter, Bolton, loc. cit.; from scarlet roses: Harborne, Experientia 17, 72 (1961). Identity with monardin and salvinin: Robinson, Todd, J. Chem. Soc. 1932, 2488. Identity with punicin: Karrer, Widmer, Helv. Chim. Acta 10, 67 (1927). Structure: Leon et al., J. Chem. Soc. 1931, 2672. Red needles with green luster from methanol + HCl, dec 175-180°. [α]$_D$ –291°. Absorption max (methanol + HCl): 269, 505 nm. Sol in water, alc.
**3-Glucoside.** [18466-51-8] 3-(β-D-Glucopyranosyloxy)-5,7-dihydroxy-2-(4-hydroxyphenyl)-1-benzopyrylium chloride; callistephin. C$_{21}$H$_{21}$ClO$_{10}$; mol wt 468.84. From purple-red aster (Callistephus chinensis (L.) Nees, Compositae): Willstätter, Burdick, Ann. 412, 149 (1916); from strawberries: Sondheimer, Kertesz, J. Am. Chem. Soc. 70, 3476 (1948). Structure and synthesis: Robertson, Robinson, J. Chem. Soc. 1928, 1460. Dark brownish-red needles with bronze luster. Absorption max (ethanol + HCl): 515 nm (ε 13,000). Sol in water, methanol, ethanol, 0.5-7% aq HCl.

**7143. Pelletierine.** [4396-01-4] 1-(2-Piperidinyl)-2-propanone; 2-acetonylpiperidine; punicine. C$_8$H$_{15}$NO; mol wt 141.21. C 68.04%, H 10.71%, N 9.92%, O 11.33%. From the rootbark of the pomegranate tree, Punica granatum L., Punicaceae. Isoln: Tanret, Compt. Rend. 86, 1270 (1878). Structure: Gilman, Marion, Bull. Soc. Chim. France 1961, 1993; Drillien, Viel, ibid. 1963, 2393. Abs config: H. C. Beyerman et al., Rec. Trav. Chim. 86, 80 (1967). Synthesis: Anet et al., Nature 164, 501 (1949); T. Nagasaka et al., Heterocycles. 29, 155 (1989).



**Isopelletierine.** [539-00-4] (±)-Pelletierine. Slightly colored oily liq; bp 195°; bp$_{11}$ 102-107°. d$_4^{20}$ 0.988. Sol in alc,

n-NONANOIC ACID (PELARGONIC ACID)                                    12/23/2006 03:23 PM



# n-NONANOIC ACID

**PRODUCT IDENTIFICATION**

| | |
|---|---|
| CAS NO. | 112-05-0 |
| EINECS NO. | 203-931-2 |
| FORMULA | $CH_3(CH_2)_7COOH$ |
| MOL WT. | 158.24 |
| H.S. CODE | 2915.90 |
| TOXICITY | Oral rat LD50: >5 gm/kg |
| SYNONYMS | 1-Octanecarboxylic acid; n-Pelargonic Acid; |

Nonanoic Acid; 1-octanecarboxylic Acid; Nonylic Acid; Acide Nonylique Normal; Acide
Pelargonique; Hexacid C-9; Octane-1-carboxylic Acid; Pelargic Acid; Pelargon (Russian);
DERIVATION
CLASSIFICATION
**PHYSICAL AND CHEMICAL PROPERTIES**

| | |
|---|---|
| PHYSICAL STATE | clear to yellowish oily liquid |
| MELTING POINT | 11 C |
| BOILING POINT | 253 C |
| SPECIFIC GRAVITY | 0.907 |
| SOLUBILITY IN WATER | Insoluble |
| pH | |
| VAPOR DENSITY | 5.45 |
| AUTOIGNITION | 405 C |
| NFPA RATINGS | Health: 3 Flammability: 1 Reactivity: 0 |
| REFRACTIVE INDEX | 1.4322 |
| FLASH POINT | 114 C |
| STABILITY | Stable under ordinary conditions |

**DESCRIPTION AND APPLICATIONS**

Pelargonic acid is a clear to yellowish oily liquid. It is insoluble in water but soluble in ether, alcohol
and organic solvents. The molecules of most natural fatty acids have an even number of carbon
chains due to the linkage together by ester units. Analogous compounds of odd numbers carbon
chain fatty acids are supplemented synthetically. Pelargonic acid, C-9 odd numbers carbon chain
fatty acid, is relatively high cost fatty acid. Pelargonic acid can be prepared by ozonolysis which
uses ozone is to cleave the alkene bonds. Eexample of ozonolysis in commerce is the production of
odd carbon number carboxylic acids such as azelaic acid and pelargonic acid and simple
carboxylic acids such as formic acid and oxalic acid.

Pelargonic acid forms esters with alcohols to be used as plasticizers and lubricating oils. It is used in
modifying alkyd resins to prevent discolor and to keep flexibility and resistance to aging since
saturated pelargonic acid will not be oxidized. Metallic soaps (barium and cadmium) and other
inorganic salts used as a stabilizer. It is also used as a chemical intermediate for synthetic flavors,
cosmetics, pharmaceuticals and corrosion inhibitors. It is known that C8 - C12 straight and
saturated chain fatty acids are capable of removing the waxy cuticle of the broadleaf or weed,

NOTE: This is a specimen label for electronic distribution. Always refer to product label on container for specific directions for use.



# QUIK - RTU

- Kills Weeds, Algae And Moss
- Eliminates Unwanted Vegetation Fast
- Won't Stain Bricks, Concrete Or Asphalt
- Fast-Acting — Kills Within Hours

ACTIVE INGREDIENT:
Ammoniated soap of fatty acids ............................3.68%
INERT INGREDIENTS: ...............................................96.32%
            TOTAL ...............................................100.00%

EPA Reg. No. 67702-7-54705       EPA Est. No. 48498-CA-1

U.S. Patent Number 5,919,733
Sold under a license of W. Neudorff GmbH KG, Germany

NET CONTENTS: _____

For medical or transportation emergencies,
call CHEMTREC at 1-800-424-9300

Manufactured For:
**LAWN AND GARDEN PRODUCTS, INC.**
P. O. Box 35000 • Fresno, CA 93745 • (559) 499-2100
www.montereylawngarden.com

## KEEP OUT OF REACH OF CHILDREN
# CAUTION

| FIRST AID | |
|---|---|
| If In Eyes: | • Hold eye open and rinse slowly and gently with water for 15-20 minutes. Remove contact lenses, if present, after the first 5 minutes, then continue rinsing. <br> • Call a poison control center or doctor for treatment advice. |
| If Inhaled: | • Move person to fresh air. <br> • If person is not breathing call 911 or an ambulance, then give artificial respiration, preferably mouth-to-mouth if possible. <br> • Call a poison control center or doctor for further treatment advice. |
| Have the product container or label with you when calling a poison control center or doctor or going for treatment. | |

## PRECAUTIONARY STATEMENTS
### HAZARDS TO HUMANS AND DOMESTIC ANIMALS

**CAUTION:** Causes moderate eye irritation. Harmful if inhaled. Avoid contact with eyes or clothing. Avoid breathing vapor. Wash thoroughly with soap and water after handling. Remove contaminated clothing and wash clothing before reuse.

### ENVIRONMENTAL HAZARDS

This product may be hazardous to aquatic invertebrates. Do not apply directly to water.

QUIK-RTU is a fast-acting weed, algae and moss killer. It does not stain concrete or pavement. QUIK-RTU is a non-selective herbicide that controls many common annual weeds. QUIK-RTU suppresses the growth of some bi-annual and perennial weeds. It can be used in cultivated areas prior to planting grass, flowers and vegetables. Areas can be re-sown five days after treatment. QUIK-RTU can be used at any time during the year. Best results are obtained with young, actively growing weeds, less than five inches in size.

## DIRECTIONS FOR USE

It is a violation of Federal Law to use this product in a manner inconsistent with its labeling.

Shake well before using. Do not dilute.

Spray weeds thoroughly when weather is dry and warm. If rain falls within three hours of application an additional application may be required. Repeat treatment every 2 to 3 weeks for control of new growth. Avoid spraying desirable plants. For optimum results, spray weeds before they reach 5 inches in size.

**Controls:** Annual bluegrass, chickweed, corn spurry, groundsel, lamb's-quarters, large crabgrass, mouse-eared chickweed, mustards, redroot pigweed, round leaved mallow, sheep sorrel, shepherd's-purse, stinkweed, thistle.

**Use Sites:** Patios, driveways, sidewalks, roofs and in planting beds prior to planting grass, flowers and vegetables.

## STORAGE AND DISPOSAL

Do not contaminate water, food or feed by storage or disposal.
**STORAGE:** Store unused material, tightly closed, in original container only, away from open flame. Do not store at temperatures below 39°F.
**PESTICIDE AND CONTAINER DISPOSAL:** Securely wrap original container in several layers of newspaper and discard in trash.

Buyer assumes all responsibility for safety and use not in accordance with directions.

# EXHIBIT F

From: Joan Smiley [mailto:joaniesmiley@yahoo.com]
Sent: Monday, April 02, 2007 3:04 PM
To: Debbie Posey
Subject: More information - infringement
Debbie,

I did not share this with you on Friday. We continue to aggressively
pursue all infringers of Falcon Lab intellectual property. You may or
may not be aware of patent law so thought I would share this:

We believe that Gardens Alive is guility of, namely "inducement to
infringe". Our
patent, covers the USE of ammonium pelargonate (AP) to kill weeds.  The
USER of
AP to kill weeds is the actual infringer unless they buy Racer from
Falco Lab or someone who has a license from us that gave them (the user)
permission to kill weeds with AP. Gardens Alive is selling AP (product
formulation for Weed-A-Side) to use as a weed killer, so they are
inducing or encouraging their customers to infringe our patent. Under
U.S. patent law, inducement to infringe carries the same penality as
infringement. If found guility in a law suit, Gardens Alive would be
subject to triple damages, i.e. three times what they
made by selling the infringing product since our patent issued.

I am having further discussions with our attornies later today to
determine our next steps in this pursuit.

Regards,
Joanie

Joan M. Smiley, President
Falcon Lab, LLC
www.falconlabllc.com
513-310-2288

----- End of forwarded message -----

# EXHIBIT G

*Herbert M. Wolfson*
*Attorney At Law*
*1213 Brook Drive*
*Wilmington, Delaware 19803*

October 23, 2007

H. Lee Scott, Jr., President and CEO
Wal-Mart Stores, Inc.
Bentonville, AR 72716-8611

Sir:

**Re: Wal-Mart Sales of "Garden Safe Brand® Weed and Grass Killer"**

Since Wal-Mart sells the subject product in certain of your stores, I have been asked to call your attention to the enclosed U. S. Patent 6,323,156 (Inventor: R. A. Smiley) that issued November 27, 2001 and is assigned to Falcon Lab LLC, Wilmington, DE.

U.S. Patent 6,323,156 claims (*inter alia*):

**A method for eliminating undesirable vegetation by applying an effective amount of an aqueous solution containing ammonium pelargonate as the active ingredient wherein non more than 0.5% of the active ingredient is the free acid, i.e. pelargonic acid.**

Column 1, lines 62-64 of the patent read:

"In a most preferred embodiment, the herbicidal composition...contains essentially no free fatty acid."

According to the enclosed Material Safety Data Sheet (MSDS) for the subject product, it is an aqueous 3.68% solution of ammonium soaps of fatty acids (confirmed by chemical analysis to be primarily ammonium pelargonate) as the active ingredient with no free acid at an alkaline pH of 7.8.

Wal-Mart's sale of "Garden Safe Brand® Weed and Grass Killer" constitutes an infringement of Falcon Lab's U. S. Patent 6,323,156 under § 271(b) and (c) of Title 35, Chapter 28 of the U. S. Patent Laws as cited below:

### § 271. Infringement of patent

(a) Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefore, infringes the patent.

(b) Whoever actively induces infringement of a patent shall be liable as an infringer.

(c) Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

Falcon is aware of the fact that the Schultz Company, a subsidiary of Spectrum Brands, is supplying this product to Wal-Mart under a registration license from W. Neudorff GmbH KG of Germany based originally on an admittedly irrelevant patent of Neudorff's. Both Spectrum Brands and Neudorff will receive copies of this letter.

Falcon Lab LLC hereby requests that Wal-Mart cease sales of the subject product until a license is obtained by Wal-Mart to U. S. Patent 6,323,156 or through Spectrum Brands or Neudorff under a similar license. Such a license is hereby offered to the recipients of this letter.

I look forward to a response within 30 days.

Respectfully,

Herbert M. Wolfson
Attorney for Falcon Lab

Cc:    Amy J. Yoder, Executive Vice-President
       Spectrum Brands
       13260 Corporate Exchange Drive
       Bridgeton, MO 63044

Cameron D. Wilson, Operations Manager
Neudorff North America
PO.Box 178
Brentwood Bay, BC Canada
V8M IR3
Canada

Joan M. Smiley, President
Falcon Lab LLC

US006323156B1

US 006323156B1

(12) **United States Patent**
Smiley

(10) Patent No.: US 6,323,156 B1
(45) Date of Patent: Nov. 27, 2001

(54) METHOD OF USING AMMONIUM FATTY ACID SALTS AS NON-SELECTIVE HERBICIDES

(75) Inventor: Robert A. Smiley, Wilmington, DE (US)

(73) Assignee: Falcon Lab LLC, Wilmington, DE (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: 09/560,664

(22) Filed: Apr. 27, 2000

(51) Int. Cl.⁷ ............................... A01N 37/00
(52) U.S. Cl. ............................... 504/320
(58) Field of Search ..................... 504/320

(56) References Cited

U.S. PATENT DOCUMENTS

5,919,733 * 7/1999 Sofan et al. .................. 504/320

* cited by examiner

*Primary Examiner*—Alton Pryor
(74) *Attorney, Agent, or Firm*—Locke Liddell & Sapp LLP

(57) **ABSTRACT**

A method for controlling undesired vegetation that comprises contacting the vegetation with a herbicidally effective amount of a composition containing the compound of the formula $R_1COO^-X^+$ wherein $R_1$ is a $C_6$ to $C_{19}$ hydrocarbyl group optionally substituted with one or more hydroxyl or $C_1$-$C_3$ hydrocarbyl groups, and X is ammonium.

20 Claims, No Drawings

Schultz Company
P. O. Box 4406
Bridgeton, MO 63044-0406

# Material Safety Data Sheet

Complies with OSHA's Hazard Communication Standard, 29 CFR 1910.1200

| Hazardous Material Identification System — (HMIS) | |
|---|---|
| HEALTH — 1 | REACTIVITY — 0 |
| FLAMMABILITY — 0 | PERSONAL — |

| I  Trade Name: Garden Safe Brand Weed & Grass Killer |
|---|

| Product Type: Liquid Ready-to-Use Herbicide |
|---|

| Product Item Number: 93065 | Formula Code Number: 21-0923 |
|---|---|

| EPA Registration Number | Manufacturer | Emergency Telephone Numbers |
|---|---|---|
| 67702-7-39609 | Chemsico 8494 Chapin Industrial Drive St. Louis, MO 63114 | For Chemical Emergency: 1-800-633-2873 For Information: 1-800-257-3379 Prepared by: C.A. Duckworth Date Prepared: JULY 21, 2006 |

## II  Hazards Ingredient/Identity Information

| Chemical | % | OSHA PEL | ACGIH-TLV |
|---|---|---|---|
| Ammoniated soap of Fatty acids CAS #84776-33-0 | 3.68 | NA | NA |

## III  Physical and Chemical Characteristics

| | |
|---|---|
| Appearance & Odor: | Light yellow colored solution. Mild Odor |
| Boiling Point: | N/A |
| Melting Point: | NA |
| PH | 7.8 |
| Vapor Pressure: | NA |
| Specific Gravity: | 0.99 ($H_2O$=1) |
| Vapor Density: | greater than 1 (Air=1) |
| % Volatile (by vol.): | greater than 95% |
| Solubility in Water: | 100% |
| Evaporation Rate: | Less than 1 (Butyl Acetate=1) |

## IV  Fire and Explosive Hazards Data

| | |
|---|---|
| Flash Point: | >220 F (TCC) |
| Flame Extension: | NA |
| Flammable Limits: | NA |
| Autoignition Temperature: | NA |
| Fire Extinguishing Media: | Water fog, Carbon dioxide, Dry chemical |
| Decomposition Temperature: | NA |
| Special Fire-Fighting Procedures: | Use procedures for elimination of original source of fire. |
| Unusual Fire & Explosion Hazards: | Vapors are heavier than air. |

## V  Reactivity Data

| | |
|---|---|
| Stability: | Stable |
| Polymerization: | Will not occur |
| Conditions to Avoid: | None |
| Incompatible Materials: | N/A |
| Hazardous Decomposition or Byproducts: | N/A |

## VI  Health Hazard Data

Skin Contact: Harmful if inhaled. *First Aid:* Move person to fresh air. If person is not breathing call 911 or an ambulance, then give artificial respiration, preferably mouth-to-mouth. Call a Poison Control Center or doctor for treatment advice. Eye Contact: Causes moderate eye irritation. *First Aid:* Hold eye open and rinse slowly and gently with water for 15-20 minutes. Remove contact lenses if present after the first 5 minutes then continue rinsing eye. Call for a Poison Control Center or doctor for treatment advice.
**Special Notes:**  Have product container with you when calling.
Health conditions Aggravated by Exposure:  Skin disorders
Ingredients listed by NTP, OSHA, or IARC
  as Carcinogens or Potential Carcinogens:    None

## VII  Precautions for Safe Handling and Use

Steps to be Taken in Case Material is Released or Spilled:
  Avoid breathing vapors. Avoid skin contact with liquid. Soak up with absorbent material.

Waste Disposal:
  If empty: Do not reuse this container. Place in trash or offer for recycling if available. If partially filled: Call your local solid waste agency or 1-800-CLEANUP for disposal instructions. Never pour unused product down any indoor or outdoor drain.

Handling & Storage Precautions:
  Do not contaminate water, food or feed by storage or disposal. Store in original container

## VIII  Control Measures

Read and follow label directions. They are your best guide to using this product effectively, and give necessary safety precautions to protect your health.

## IX  Transportation Data

DOT: Not Regulated by DOT (limited quantity exception)
IMDG: Not Regulated by IMDG (limited quantity exception)
IATA: Not Regulated by IATA (limited quantity exception)

The information and statements herein are believed to be reliable but are not to be construed as warranty or representation for which we assume legal responsibility. Users should undertake sufficient verification and testing to determine the suitability for their own particular purpose of any information or products referred to herein. NO WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE IS MADE.

# EXHIBIT H

*Herbert M. Wolfson*
*Attorney At Law*
*1213 Brook Drive*
*Wilmington, DE 19803*
*302-762-1476*

November 5, 2007

President
Lawn and Garden Products
P. O. Box 35000
Fresno, CA  93745-5000

Sir:                              **Re: HERBICIDAL SOAP**

I have been asked to call your attention to the enclosed U. S. Patent 6,323,156 that issued November 27, 2001 and is assigned to Falcon Lab LLC, Wilmington, DE.

U.S. Patent 6,323,156 claims (*inter alia*):

**A <u>method</u> for eliminating undesirable vegetation by applying an effective amount of an aqueous solution containing ammonium pelargonate as the active ingredient wherein no more than 0.5% of the active ingredient is the free acid, i.e. pelargonic acid.**

Column 1, lines 62-64 of the patent read:

"In a most preferred embodiment, the herbicidal composition...<u>contains essentially no free fatty acid</u>."

According to the enclosed Material Safety Data Sheet (MSDS) for Monterey's subject product, your "HERBICIDAL SOAP" is an aqueous 19-23% solution of ammonium soaps of fatty acids (confirmed by chemical analysis to be ammonium pelargonate) as the active ingredient with no free acid at a pH of 8.4. In fact, evaporating your "HERBICIDAL SOAP" to dryness in air will produce solid ammonium pelargonate.

Lawn and Garden Product's sale of "HERBICIDAL SOAP" constitutes an infringement of Falcon Lab's U. S. Patent 6,323,156 under § 271(b) (**inducement to infringe**) of Title 35, Chapter 28 of the U. S. Patent Laws as cited below:

**§ 271. Infringement of patent**

**(a) Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefore, infringes the patent.**

**(b) Whoever actively induces infringement of a patent shall be liable as an infringer.**

Falcon is aware of the fact that Monterey is operating under a registration license from W. Neudorff GmbH KG of Germany that was based originally on an admittedly irrelevant patent of Neudorff's. Neudorff will receive a copy of this letter but they are very aware that by supplying the formula or raw material for "HERBICIDAL SOAP" to your company, they are guilty of contributory infringement under § 271(c) of Title 35, Chapter 28 of U. S. Patent Law that states as follows:

**(c) Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.**

Falcon Lab LLC hereby requests that Lawn and Garden Products immediately cease advertising and selling the subject product until a license is obtained to U. S. Patent 6,323,156 from Falcon Lab LLC or through another company that has the rights to offer such a license. We hereby also request an accounting of the sales of Monterey "HERBICIDAL SOAP" by your company since the issuance of the patent on November 27, 2001.

I am available at the above address or phone number to discuss possible settlement of this situation with any representative of your company. Unless I hear from you in 30 days, Falcon Lab will consider further actions to protect their patent.

Respectfully,

Herbert M. Wolfson
Attorney for Falcon Lab

Cc:    Cameron D. Wilson, Operations Manager
       Neudorff North America
       PO.Box 178
       Brentwood Bay, BC Canada
       V8M IR3 Canada

       Joan M. Smiley, President
       Falcon Lab LLC